INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Boeing Company, Intervenor.

No. 75–1056.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 1, 1976.

Decided June 13, 1978.

Certiorari Denied Jan. 8, 1979. See 99 S.Ct. 839.

---

Mozart G. Ratner, Washington, D. C., with whom Plato E. Papps and Denis F. Gordon, Washington, D. C., were on the brief, for petitioner.

Peter Carre, Atty., N.L.R.B., Washington, D. C., with whom John S. Irving, Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Robert Sewell, Atty. N.L.

R.B., Washington, D. C., were on the brief, for respondent.

Before LEVENTHAL, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court filed by SPOTTS-WOOD W. ROBINSON, III, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Petitioner, International Association of Machinists and Aerospace Workers, AFL–CIO (IAM), complained to the National Labor Relations Board that the Boeing Company, as a successor employer, unlawfully refused to bargain with IAM over the initial terms and conditions of the successor employment. The Board interpreting Supreme Court pronouncements on the subject,[1] concluded that Boeing had no clear plan to incorporate as a majority of its own workforce employees of the predecessor employer[2]—a prerequisite to an obligation to bargain with incumbent employees over initial employment terms[3] and the litigation is now before us for review of the decision and order of the Board dismissing IAM's complaint.[4] We accept the Board's construction and application of Supreme Court doctrine on the duty of a successor employer to negotiate with an incumbent union before fixing such terms and accordingly affirm.

I

For seven years prior to March 31, 1971, Trans World Airlines (TWA), pursuant to contract, performed installation support services for the National Aeronautical and Space Administration (NASA) at the Kennedy Space Center. These services included test support management, plant engineering and maintenance, and logistical functions relating to NASA's utilization of the Center as a principal space-launch site. Since February, 1964, TWA had recognized IAM as the exclusive bargaining representative of the employees performing such services at the Center; and as of March 7, 1971, 1,054 of these employees were covered by an agreement between IAM and TWA for an effective term extending from January 28, 1970, through the end of 1971. The agreement was a company-wide contract encompassing all TWA operations in the Nation and by its terms was governed by the Railway Labor Act.[5]

On June 30, 1970, NASA invited bids for an undertaking to furnish essentially the same installation support services as those previously supplied by TWA.[6] The term of the undertaking was to be one year commencing April 1, 1971, subject to extensions for successive one-year terms at NASA's option. In response to the invitations, proposals were submitted to NASA by TWA, Boeing and five other companies. The labor costs specified in Boeing's principal bid were based specifically upon the wage rates and fringe benefits stipulated in its existing national agreement with IAM, which also applied to Boeing's "hardware contracts" with NASA for the Center.[7] These costs were substantially below those set by TWA's preexisting agreement with IAM for the installation support service unit.

1. See Parts II–III infra.

2. Boeing Co., 214 N.L.R.B. 541 (1974). Members Fanning and Panello dissented.

3. See text infra at note 34.

4. Our jurisdiction rests on § 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f) (1970).

5. 45 U.S.C. § 151 et seq. (1970).

6. Among other minor changes, mail and distribution services affecting 51 unit employees were eliminated. The assumption of that work by a new contractor gave rise to other litigation in this court. IAM v. NLRB, 162 U.S.App.D.C. 138, 498 F.2d 680 (1974).

7. Boeing has had various "hardware contracts" with NASA at the Center dating from 1952. Under these agreements Boeing was responsible for "launch support services," usually involving research and testing, associated with particular missile projects. The programs overlapped while earlier enterprises were phased out and new programs initiated. During these transition periods, employees were transferred between projects.

NASA's invitation required bidders to explain their recruiting plans, including the "approximate number," by type, of existing employees to be hired. Boeing proposed to acquire 85.6% of its total work force for the operation from incumbent employees. This figure was derived after computing the number of Boeing employees who would transfer to the operation, the number to be recalled from layoff from Boeing employment in the area, and the number with known talent available in the area for employment. Boeing stated that its staffing proposal "recognize[d] the desirability of retaining incumbent contractor personnel to provide continuity of functional support," [8] and reported that its "analysis indicate[d] that effectiveness and economy can be achieved by retaining experienced and qualified incumbent personnel." [9] Boeing's proposition repeatedly noted a need for continuity and its intent to hire incumbent employees,[10] but observed that "[w]hile the staffing plan is based on retaining approximately 86 percent of the incumbent personnel, [Florida State Employment Service] data indicated that the local labor market is sufficient in both skills and number to provide the staffing requirements of this contract.[11]

On November 23, 1970, NASA announced that it had selected Boeing as the party with which it would negotiate a contract to provide the installation support services at the Center. Subsequently, Boeing request-. ed a meeting with IAM to discuss the company's bid, and at the meeting, on December 4, 1970, Boeing emphasized that its proposal to NASA was based on its current "hardware contract" at the Center. At an internal meeting on the next day, IAM officials agreed that they could not accept Boeing's plan to apply its existing contract with IAM to installation support service employees because that would result in a reduction in wages and benefits for such of them as were incumbents.[12] IAM promptly communicated its decision to Boeing and NASA,

---

8. *Boeing Co., supra* note 2, 214 N.L.R.B. at 543.

9. *Id.*

10. *Boeing* proposed a lengthy baseline phase-in plan, one criterion of which was that "Boeing can and will staff the majority of the total work force from the incumbent contractor." *Id.* Additionally, Boeing's industrial relations chief at the Center declared that Boeing expected to hire a work force of approximately 1,000 employees, of whom it proposed to recruit "[a]ll" the TWA personnel "we could get," *id.,* not less than 86% and "closer to 100 percent," *id.* The proposal outlined detailed selection procedures stressing retention of incumbents, and Boeing announced to the press its intention to obtain the bulk of its work force from incumbent employees. Newspapers circulating in the county in which the Center is situated reported that Boeing would hire a "majority" or a "large percentage" of TWA incumbents, *id.,* and Boeing was quoted as saying that it "want[ed] to upset the community as little as possible." *Id.* At Boeing's first meeting with IAM in late November, 1970, and at their second meeting on December 4, 1970, Boeing indicated to IAM that it would retain most of the TWA employees. During phase-in of the project, Boeing's employment supervisor told IAM "that we desire[ ] to employ in essence most of our required employees from the ranks of the incumbent contractor," *id.,* and Boeing informed TWA at a meeting on November 30, 1970, that "most of [the TWA employees] would be hired," *id.* TWA officials reported that Boeing "hoped to hire the majority[;] . . . [it] desired to hire as many TWA people as possible," *id.,* and on December 1, 1970, TWA advised its employees that "Boeing is interested in hiring the majority of [TWA] employees" at the Center. *Id.*

11. *Id.* at 549 (decision of administrative law judge). Boeing consulted the Florida State Employment Service and was notified in August, 1970, that qualified personnel in the desired classifications could readily be obtained from available manpower in the county. To survey the local market, Boeing advertised in a local newspaper on July 26 and August 7 for applicants for employment on the project and received numerous affirmative responses.

12. After occurrence of the events leading to this litigation, the Service Contract Act, 41 U.S.C. §§ 351 *et seq.* (1970), was amended to provide that no successor government contractor may pay its employees less than the wages and fringe benefits set forth in the previous contractor's collective bargaining agreement. Service Contract Act Amendments of 1972, Pub.L. No. 92–473, § 3(b), 86 Stat. 789, 41 U.S.C. § 353(c) (Supp. II 1972); see *Boeing Co. v. IAM,* 504 F.2d 307, 311–312 & n. 7 (5th Cir. 1974), *cert. denied,* 421 U.S. 913, 95 S.Ct. 1570, 43 L.Ed.2d 779 (1975). The amendment was not made retroactive. *Id.*

indicating that IAM would insist on perpetuation of the agreement with IAM and TWA for these employees.

Despite vigorous protests by TWA and IAM, NASA contracted with Boeing for the installation support services on March 11, 1971. On the day following, IAM requested recognition by Boeing and again urged adoption of the TWA–IAM collective bargaining agreement. Boeing replied on March 19 that it recognized IAM as the representative of the employees on the assumption that they would become an accretion to the unit already covered by the Boeing-IAM contract rather than a distinct unit.[13] Boeing predicted that IAM would lack majority representation of the installation and support service workforce, and indicated that the Boeing-IAM contract would be implemented without change.

On April 1, 1971, Boeing began performance of the contract with a workforce of 970, including 380 TWA incumbents, 138 Boeing employees—transferred or recalled from layoff, or formerly Boeing personnel —450 outsiders and two employees unidentified as to source. Each hourly employee arriving for work on and after April 1 was given a copy of the Boeing-IAM agreement.

As the Boeing-IAM national agreement was to expire on October 1, Boeing and IAM commenced negotiations on or about August 3, 1971 for a replacement. On November 12, 1971, the parties entered into a new nationwide agreement effective from December 13, 1971, through October 1, 1974, with a provision for automatic yearly renewal. Throughout the negotiations, each side maintained its legal position on the applicability of the TWA-IAM contract to the installation support service unit at the Center.[14]

On May 10, 1973, the Board's General Counsel issued a complaint, upon charges filed by IAM, alleging a violation of Section 8(a)(5) of the National Labor Relations Act[15] arising from Boeing's failure to consult IAM on the initial terms and conditions of employment for the installation support services unit.[16] An administrative law judge recommended that the complaint be dismissed in its entirety.[17] Relying on a number of factors, the judge rejected IAM's contention that Boeing had a "perfectly clear" plan to retain a substantial majority of incumbent employees[18]—a plan that would have created an obligation on Boeing's part, under the Supreme Court's *Burns* holding,[19] to consult with IAM before setting initial employment terms.[20] Although the Board agreed with the administrative law judge's conclusions and adopted his recommended order, it expressly chose

13. In adjudicating IAM's claim of unlawful unilateral successor conduct, the administrative law judge observed that if, as Boeing maintained, the appropriate unit were to consist of the installation support service employees in combination with employees already engaged pursuant to Boeing's current hardware contracts with NASA, terms and conditions for all such employees would have been governed by the existing Boeing-IAM agreement; but the judge regarded the accretion principle inapplicable in the circumstances of the case. *Boeing Co., supra* note 2, 214 N.L.R.B. at 558–559 (decision of administrative law judge).

14. IAM filed grievances and sought to compel Boeing to arbitrate under the IAM–TWA agreement. The issue was resolved against IAM in a suit under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (1970), filed by Boeing for a declaratory judgment that it was not bound by that agreement. *Boeing Co. v. IAM, supra* note 12. In *IAM v. Hodgson,* 169 U.S.App.D.C. 142, 515 F.2d 373 (1975), IAM failed in its suit for damages under the

Service Contract Act of 1965, 41 U.S.C. § 351 *et seq.* (1970 & Supp. II 1972), as amended by Act of Apr. 21, 1976, Pub.L. No. 94–273, § 29, 90 Stat. 380, and Act of Oct. 13, 1976, Pub.L. No. 94–489 §§ 1–2, 90 Stat. 2358.

15. 29 U.S.C. § 158(a)(5) (1970).

16. The complaint also asserted violations of §§ 8(a)(1) and (3), 29 U.S.C. §§ 158(a)(1), (3) (1970), which are not pertinent here.

17. The decision of the administrative law judge is appended to that of the Board. *Boeing Co., supra* note 2, 214 N.L.R.B. at 545.

18. *Id.* at 559–560.

19. *NLRB v. Burns Int'l Security Servs., Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).

20. See Part II *infra.*

to ground its decision solely on the reasons set forth in its *Spruce Up* opinion [21] as applied to the facts of the instant case.[22] The Board's order was followed by the petition to this court for review.

## II

An employer's collective bargaining obligation derives from Section 8(a)(5) of the National Labor Relations Act, which makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section [9(a)] of [the Act]." [23] Section 9(a) provides in pertinent part that "[r]epresentatives designated or selected for the purpose of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining  .  .  .." [24] By conjunctive operation of these two sections, a union representing a majority of the employees in an appropriate bargaining unit may compel the employer to negotiate with respect to the terms and conditions of employment applicable to that unit.

In *Burns*,[25] the Supreme Court considered the impact of employer succession on the bargaining status of a union previously selected by the predecessor employer's labor force. Like the case before us, *Burns* involved a succession to duties under a service contract; Burns International Security Services, Inc., had replaced Wackenhut Corporation, which for five years had provided plant-protection services for Lockheed Aircraft Service Company at an airport. Burns retained 27 of the Wackenhut guards and completed its workforce with 15 of its own transferees from other Burns locations. Burns refused to deal with the United Plant Guard Workers of America (UPG), which less than four months earlier had been certified after a Board-supervised election as the exclusive bargaining representative of Wackenhut's employees. UPG demanded that Burns recognize it as the representative of the Burns workforce at the airport and that Burns honor the UPG–Wackenhut collective bargaining agreement.

■■■ Addressing Burns' alleged duty to negotiate with the union,[26] the Court held that when a bargaining unit is left undisturbed by employer succession and a majority of the unit's employees hired by the new employer are already represented by a union as the recently certified bargaining agent, an order directing the employer to bargain with the union implements wholesomely the express mandates of Sections 8(a)(5) [27] and 9(a) [28] of the Act.[29] But, the Court held, assumption of Wackenhut's col-

21. *Spruce Up Corp.,* 209 N.L.R.B. 194 (1974), enforced *per curiam on other grounds,* 90 L.R. R.M. 2525 (4th Cir. Sept. 16, 1975).

22. *Boeing Co., supra* note 2, 214 N.L.R.B. at 541 (with Members Fanning and Panello dissenting).

23. *Supra* note 15.

24. 29 U.S.C. § 159(a) (1970).

25. *NLRB v. Burns Int'l Security Servs., Inc., supra* note 19.

26. Whether a new employer must assume the responsibilities of his predecessor will depend on what obligations are at issue. A new employer may be a "successor" for some purposes and not for others. See *Howard Johnson Co. v. Hotel & Restaurant Employees,* 417 U.S. 249, 262–263 n. 9, 94 S.Ct. 2236, 2243–2244 n. 9, 41 L.Ed.2d 46, 56–57 n. 9 (1974); *IAM v. NLRB,* 134 U.S.App.D.C. 239, 244, 414 F.2d 1135, 1140, *cert. denied,* 396 U.S. 889, 90 S.Ct. 174,

24 L.Ed.2d 163 (1969) (concurring opinion); *Boeing Co. v. IAM, supra* note 12, 504 F.2d at 317.

27. Quoted in text *supra* at note 23.

28. Quoted in text *supra* at note 24.

29. 406 U.S. at 279, 92 S.Ct. at 1577, 32 L.Ed.2d at 68. Reading §§ 8(a)(5) and 9(a) together, the Court ruled that the incumbent union could have compelled Burns, the successor employer, to negotiate if indeed the union had been the representative of a majority of the employees in an appropriate unit. *Id.* at 277, 281, 92 S.Ct. at 1577, 1579, 32 L.Ed.2d at 67, 69; see, *e. g., Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 184 n. 6, 94 S.Ct. 414, 425 n. 6, 38 L.Ed.2d 388, 402 n. 6 (1973) ("because the purchaser is not obligated by the Act to hire any of the predecessor's employees [citing *Burns*] the purchaser, if it does not hire any or a majority of those employees, will not be bound by an outstanding order to bargain issued by the

lective bargaining contract did not follow from any duty on Burns' part to bargain since by the express terms of Section 8(d) of the Act a bargaining obligation " 'does not compel either party to agree to a proposal or require the making of a concession.' "[30] That result was reinforced, the Court said, by the practical importance of allowing a successor employer to alter the structure of a moribund business beyond the confines of a predecessor's labor agreement, as well as by the corresponding value to a union of an unshackled ability to negotiate a new contract with a more prosperous successor firm.[31]

The Court then proceeded to hold that ordinarily a successor employer may set his initial terms and conditions of employment without bargaining with the incumbent union:

Although Burns had an obligation to bargain with the union concerning wages and other conditions of employment when the union requested it to do so, this case is not like a § 8(a)(5) violation where an employer unilaterally changes a condition of employment without consulting a bargaining representative. It is difficult to understand how Burns could be said to have *changed* unilaterally any preexisting term or condition of employment without bargaining when it had no previous relationship whatsoever to the bargaining unit and, prior to July 1, no outstanding

Board against the predecessor or by any order tied to the continuance of the bargaining agent in the unit involved [citing *Burns*]"); *NLRB v. Band-Age, Inc.,* 534 F.2d 1, 3 (1st Cir.), *cert. denied,* 429 U.S. 921, 97 S.Ct. 318, 50 L.Ed.2d 288 (1976) (*Burns* identified as a significant factor in determining a successor's duty to bargain "the permissibility of assuming the continued existence of a union majority"); *NLRB v. Daneker Clock Co.,* 516 F.2d 315, 316 (4th Cir. 1975) ("more than half of Daneker's production employees had worked for its predecessor"); *Toma–A–Hawk Transit, Inc. v. NLRB,* 419 F.2d 1025, 1027 (7th Cir. 1969) (successor began operations with 24 drivers and maintenance employees, 14 of whom had worked for the predecessor); *Pacific Hide & Fur Depot, Inc. v. NLRB,* 553 F.2d 609, 611 (9th Cir. 1977) ("absent a refusal to hire because of anti-union animus, a majority of the work force of the purchasing employer in the unit [must] be former employees of the seller in that unit").

Despite the intimation in *Golden State Bottling Co., supra,* that *Burns* recognizes a successor's duty to bargain only when he hires a majority of his *predecessor's* employees, the relevant ratio—suggested by the language in *Burns* itself, see text *infra* at note 33 and 406 U.S. at 277, 281, 92 S.Ct. at 1577, 1579, 32 L.Ed.2d at 67, 69—is not the percentage of the predecessor's employees enrolled by the successor but the percentage of the *successor's* work force populated by those employees. See cases cited *supra.* This is true because the question to be resolved in light of § 9(a) is whether the incumbent union represents a majority of the successor's employees. See text *supra* at notes 24–25; *Boeing Co. v. IAM, supra* note 12, 504 F.2d at 319 & n. 18, 320 & n. 20, 321.

**30.** 406 U.S. at 282, 92 S.Ct. at 1579, 32 L.Ed.2d at 70, quoting § 8(d), 29 U.S.C. § 158(d) (1970).

**31.** 406 U.S. at 287–289, 92 S.Ct. at 1582–1583, 32 L.Ed.2d at 72–74. The Court observed that if the successor were inhibited by the former employer's contract with the union,

[i]t would seemingly follow that employees of the predecessor would be deemed employees of the successor, dischargeable only in accordance with provisions of the contract and subject to the grievance and arbitration provisions thereof. Burns would not have been free to replace Wackenhut's guards with its own except as the contract permitted.

*Id.* at 288, 92 S.Ct. at 1582–1583, 32 L.Ed.2d at 73 (footnote omitted).

We note, however, that if the successor employer refuses to hire his predecessor's employees because of their union membership or activity, or to avoid recognition of the union, he violates § 8(a)(3), 29 U.S.C. § 158(a)(3) (1970). See *Howard Johnson Co. v. Hotel & Restaurant Employees, supra* note 26, 417 U.S. at 262 n. 8, 94 S.Ct. at 2243 n. 8, 41 L.Ed.2d at 56 n. 8; *NLRB v. Burns Int'l Security Servs., supra* note 19, 406 U.S. at 280–281 n. 5, 92 S.Ct. at 1578–1579 n. 5, 32 L.Ed.2d at 69 n. 5; *Tri State Maintenance Corp. v. NLRB,* 132 U.S.App.D.C. 368, 408 F.2d 171 (1968); *K. B. & J. Young's Super Mkts. v. NLRB,* 377 F.2d 463 (9th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 71, 19 L.Ed.2d 105 (1967) (mass discharge of unit personnel to evade bargaining obligations with incumbent union held to violate § 8(a)(3), and refusal to bargain with union held to violate § 8(a)(5); *Barrington Plaza & Tragniew, Inc.,* 185 N.L.R.B. 962 (1970) (discriminatory refusal to hire incumbent employees held to violate §§ 8(a)(1) and (3); because purpose underlying refusal to hire was to evade a bargaining relationship and old employees would have constituted a majority of new work force, refusal also held to violate § 8(a)(5) and bargaining obligation imposed).

terms and conditions of employment from which a change could be inferred. The terms on which Burns hired employees for service after July 1 may have differed from the terms extended by Wackenhut and required by the collective-bargaining contract, but it does not follow that Burns changed *its* terms and conditions of employment when it specified the initial basis on which employees were hired on July 1.[32]

But, to the general rule that a successor employer may specify initial employment terms without first conferring with the union, the Court articulated an exception—on the applicability of which the present litigation turns—for circumstances in which a duty to bargain will arise early enough in the predecessor-successor transition to necessitate union involvement in designation of those terms:

> Although a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, *there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before*

*he fixes terms.* In other situations, however, it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit as required by § 9(a) of the Act, 29 U.S.C. § 159(a). Here, for example, Burns' obligation to bargain with the union did not mature until it had selected its force of guards late in June.[33]

### III

In the case at bar, the Board dealt with the *Burns* exception by referring to the principles established in its *Spruce Up* decision.[34] The Board observed that even if Boeing "intended" to hire all or substantially all [35] of TWA's employees, those "intentions" were from the outset tied to the terms and conditions specified in the Boeing-IAM nationwide agreement.[36] Quoting from its opinion in *Spruce Up*, the Board reasoned:

> When an employer who has not yet commenced operations announces new terms prior to or simultaneously with his invitation to the previous work force to accept

---

**32.** *Id.* at 294, 92 S.Ct. at 1585, 32 L.Ed.2d at 76–77. The Court thus overturned a line of Board decisions requiring a successor employer always to bargain with the incumbent union before instituting employment terms different from those prevailing under the predecessor's contract, whether or not the successor was bound by that contract. See, *e. g., Emerald Maintenance, Inc.,* 188 N.L.R.B. 876 (1971); *Valleydale Packers, Inc.,* 162 N.L.R.B. 1486 (1967), *enforced,* 402 F.2d 768 (5th Cir. 1968), *cert. denied,* 396 U.S. 825, 90 S.Ct. 66, 24 L.Ed.2d 75 (1969); *Overnite Transp. Co.,* 157 N.L.R.B. 1185 (1966), *enforced,* 372 F.2d 765 (4th Cir.), *cert. denied,* 389 U.S. 838, 88 S.Ct. 59, 19 L.Ed.2d 101 (1967).

**33.** 406 U.S. at 294–295, 92 S.Ct. at 1585–1586, 32 L.Ed.2d at 77 (emphasis supplied).

**34.** *Spruce Up Corp., supra* note 21. In an earlier decision in *Spruce Up Corp.,* 194 N.L.R.B. 841 (1972), the Board had held:

> [W]here, as here, an employer who is about to acquire a going business manifests an intent to retain his predecessor's employees they become at that point his employees for the purpose of the application of Section

8(a)(5), and he is obligated to bargain with a union which is the statutory representative of such employees.

*Id.* at 846. While the Board's original order was pending before the Fourth Circuit for enforcement, the Supreme Court decided *Burns,* and at the Board's request the case was remanded to the Board for reconsideration in light of *Burns.* See *Spruce Up Corp., supra* note 21, 209 N.L.R.B. at 194. On remand the Board modified its earlier decision and enunciated the principles at issue in the present case.

**35.** The Board has construed the Court's term "all," see text *supra* at note 33, to mean "all or substantially all" of the incumbents. *Boeing Co., supra* note 2, 214 N.L.R.B. at 541. Of course, when the successor plans to expand the total work complement such that even if all incumbents were employed they would constitute only a minority, a presumption that the extant union will represent most of the new employees cannot follow from the successor's intention to retain incumbents.

**36.** *Id.*

employment under those terms, we do not think it can fairly be said that the new employer "plans to retain all of the employees in the unit," as that phrase was intended by the Supreme Court.[37] The possibility that the old employees may not enter into an agreement relationship with the new employer is a real one . . . .[38]

Thus the Board theorized that a successor employer's intention to retain large numbers of his predecessor's employees is not likely enough to come to fruition when his offer of employment is coupled with an announcement of reduced wages and benefits, and in such instances no duty to bargain over initial terms and conditions of employment would arise.

In its *Spruce Up* opinion, the Board maintained that a construction of the *Burns*

caveat emphasizing simply the employer's manifested intentions, rather than the probability of employee acceptance of jobs with the successor, would discourage employers from commenting favorably on the employment prospects of old employees.[39] Sensitive to that concern, the Board interpreted the *Burns* exception to apply only to situations in which a successor employer has misled employees into believing that all would be retained on the basis of existing wages, hours and conditions of employment, or at least to instances in which a successor employer has failed to make plain an intention to alter terms and conditions prior to offering employment to incumbent employees.[40]

## IV

We think the Board's construction of the *Burns* exception reasonably imple-

---

37. See text *supra* at note 33.

38. *Boeing Co., supra* note 2, 214 N.L.R.B. at 541, quoting *Spruce Up Corp., supra* note 21, 209 N.L.R.B. at 195.

39. *Spruce Up Corp., supra* note 21, 209 N.L. R.B. at 195.

40. *Id.* The Board has consistently adhered to this interpretation. See, *e. g., Virginia Sportswear, Inc.,* 226 N.L.R.B. 1296 (1976); *C. M. E., Inc.,* 225 N.L.R.B. 514 (1976); *Nazareth Regional High School,* 222 N.L.R.B. 1052 (1976), *enforcement granted in part and denied in part,* 549 F.2d 873 (2d Cir. 1977); *United Maintenance & Mfg. Co.,* 214 N.L.R.B. 529 (1974); *Henry M. Hald High School Ass'n,* 213 N.L.R.B. 415 (1974); *Anita Shops,* 211 N.L.R.B. 501 (1974); *Ranch-Way, Inc.,* 203 N.L.R.B. 911 (1973).

The Sixth and Seventh Circuits have each imposed a requirement of preliminary bargaining consistent with the *Spruce Up* rule. In *Spitzer Akron, Inc. v. NLRB,* 540 F.2d 841 (6th Cir. 1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977), a successor employer expressed his intention to retain the old employees and indicated to them that the operation "would carry on as usual." The court voiced its view that "the facts in the instant case are sufficient . . . to establish that the employees were misled by 'tacit inference' into believing they would be retained without change from the condition of employment." *Id.* at 846, quoting *Brotherhood of Ry. Clerks v. REA Express, Inc.,* 523 F.2d 164, 171 (2d Cir.), *cert. denied,* 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975). In *NLRB v. Bachrodt Chevrolet Co.,* 468 F.2d 963 (7th Cir. 1972),

*vacated and remanded,* 411 U.S. 912, 93 S.Ct. 1547, 36 L.Ed.2d 304, *on remand,* 205 N.L.R.B. 784 (1973), *enforced,* 515 F.2d 512 (7th Cir.), *cert. denied,* 423 U.S. 927, 96 S.Ct. 274, 46 L.Ed.2d 255 (1975), the court approved the Board's determination of unlawful unilateral action when an employer manifested a purpose to hire his predecessor's employees without contemporaneously advising them of plans to change working conditions and thereafter fixed working conditions different from those of the predecessor. See also *Zim's Foodliner, Inc. v. NLRB,* 495 F.2d 1131, 1142–1144 (9th Cir.), *cert. denied,* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974).

In *Nazareth Regional High School v. NLRB, supra,* the Second Circuit invoked *Spruce Up* to deny a bargaining obligation where a successor employer proposed new employment terms after earlier communicating to the incumbent employees its intention to hire the entire incumbent staff without committing itself to adoption of the old terms. The Board had contended that because Nazareth failed to indicate in an initial announcement of intent to rehire all of the employees that new terms would be imposed, *Spruce Up* was distinguishable, and that a finding of a duty to bargain at that point was justified. 549 F.2d at 881. Rejecting that thesis, the court proclaimed that "[t]he important consideration in determining whether it is perfectly clear that a successor intends to retain all of the employees is whether they have been *promised* re-employment on the existing terms." *Id.* (emphasis supplied). We have no occasion to consider the restriction thus imposed.

ments the considerations reflected in *Burns* as a whole.[41] The *Burns* Court accorded much importance to a successor employer's freedom to alter—even remake—the acquired enterprise.[42] Certainly that includes the ability ordinarily to set initial employment terms and conditions without preliminary bargaining with an incumbent union.[43] The exception to the successor's normal prerogative is narrow: initial-terms bargaining, in the Supreme Court's words, need occur only in "instances in which it is *perfectly clear* that the new employer plans to retain all of the employees in the unit and in which it [is] appropriate to have him initially consult with the employees' bargaining representative." [44]

IAM insists that the *Burns* "plans to retain all" exception unambiguously mandates initial-terms negotiations whenever a successor employer manifests an intention to hire substantially all of the incumbent workforce, whether or not that objective is conditioned on acceptance of substantially reduced benefits. From the Board's viewpoint, however, the difficulty in that position is than an employer's readiness to hire only those incumbents who agree to less favorable terms may fall far short of a "perfectly clear" plan to perpetuate the old workforce as the majority in the new.[45] Recruitment objectives thus conditioned, says the Board, negate an inference of

41. When the case summons an interpretation, not of statutory language itself, but of Supreme Court pronouncements of controlling statutory principles, deference to the Board may ordinarily be less appropriate. The *Burns* exception, however, provides minimal guidance, which is supplemented only generally by the policy considerations manifested in the decision. That the proviso can and should be construed with sensitivity to conflicting policies is evident from its terms; the exception envisions preliminary bargaining in "instances in which . . it [is] *appropriate* to have [the successor] initially consult with the employees' bargaining representative." See text *supra* at note. 33. *NLRB V. Bachrodt Chevrolet, Inc., supra* note 40, 468 F.2d at 972 (dissenting opinion). Balancing competing interests to effectuate national labor policy, particularly in the successorship context, is a delicate responsibility committed primarily to the Board. See *IAM v. NLRB, supra* note 26, 134 U.S.App.D.C. at 245, 414 F.2d at 1141 (concurring opinion). Compare *NLRB v. Local 103, Ironworkers Int'l,* 434 U.S. 335, 350, 98 S.Ct. 651, 660–661, 54 L.Ed.2d 586, 598–599 (1978). We are inclined, then, to yield deference to the Board's construction once assured of its compatibility with the spirit as well as the language of the *Burns* opinion.

42. 406 U.S. at 287–289, 92 S.Ct. at 1582–1583, 32 L.Ed.2d at 72–74.

43. The *Burns* decision restricted prevailing Board doctrine under which initial-terms bargaining was the rule rather than the exception. See note 32 *supra. Burns* made the bargaining obligation ordinarily conditional on actual hiring of the predecessor's employees, thus leaving the successor usually free to fix unilaterally the terms of the hiring. Of course, once recruitment has been completed, the chosen representative of a majority of the new employees may insist that the successor negotiate with

respect to terms and conditions of employment. See note 52 *infra.*

44. See text *supra* at note 33.

45. See *Spruce Up Corp., supra* note 21, 209 N.L.R.B. at 195:

When an employer who has not yet commenced operations announces new terms prior to or simultaneously with his invitation to the previous workforce to accept employment under those terms, we do not think it can fairly be said that the new employer "plans to retain all of the employees in the unit," as that phrase was intended by the Supreme Court. The possibility that the old employees may not enter into an employment relationship with the new employer is a real one, as illustrated by the present facts. Many of the former employees here did not desire to be employed by the new employer under the terms set by him—a fact which will often be operative, and which any new employer must realistically anticipate. Since that is so, it is surely not "perfectly clear" to either the employer or to us that he can "plan to retain all of the employees in the unit" under such a set of facts.

Since the relevant factor is the degree of likelihood that incumbents will work for the successor, in some circumstances a specification of terms might refute the clarity of retention plans even though the offered terms are comparable to those afforded by the predecessor employer. Thus, in *United Maintenance & Mfg. Co., supra* note 40, the Board declined to hold unlawful a refusal to bargain over initial terms when the employer proposed to continue existing terms but the circumstances made it plain that those terms were unacceptable to incumbent employees. On the other hand, a worsening of terms conceivably may not, in some contexts, foredoom substantial retention.

probable continuity of employment[46] and, we might add, without more the incumbent union cannot fairly claim to represent the larger number of the successor's prospective employees. In such circumstances, as the Court observed in *Burns,* "it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with the union, since it will not be evident until then that the bargaining representative represents the majority of the employees in the unit as required by Section 9(a) of the Act . . . ."[47]

We think, then, that the Board may with ample reason conclude that only when an employer has indicated a purpose to retain incumbents, but has not concomitantly proposed substantial reductions in benefits, can it "be evident" that the incumbent union "represents a majority of the employees in the [successor] unit" prior to actual induction of the predecessor employees, and that only then may the union demand a say about initial terms of successor employment. To be sure, in view of the substantial harmony existent in the parties' positions, only minor adjustments in initial terms may then remain to be negotiated, and it must be acknowledged that compulsory bargaining usually yields greater returns when labor-management differences are of more appreciable magnitude. It cannot be gainsaid, however, that some affiliation between employer and employee must be at least presumable as a threshold matter before an obligation to bargain arises. So long as perpetuation of the incumbent workforce remains highly speculative, that precondition is not met.

Even when *Burns* is read, as the Board does, to limit compulsory initial-terms bargaining to situations wherein the successor has indicated that incumbents will be retained and has not concurrently announced downward changes in employment terms, predecessor-employees are afforded an important measure of protection. Once the duty to bargain has thus attached, the successor is obliged to consult the incumbent union before institution of less satisfactory terms. That is significant because unconditional retention-announcements engender expectations, ofttimes critical to employees, that prevailing employment arrangements will remain essentially unaltered. Even when incumbents are not affirmatively led to believe that existing terms will be continued,[48] unless they are apprised promptly of impending reductions in wages or benefits, they may well forego the reshaping of personal affairs that necessarily would have occurred but for anticipation that successor

**46.** See note 45 *supra.*

**47.** *NLRB v. Burns Int'l Security Servs., Inc., supra* note 19, 406 U.S. at 295, 92 S.Ct. at 1586, 32 L.Ed.2d at 77; see *Pacific Hide & Fur Depot, Inc. v. NLRB, supra* note 29, 553 F.2d at 612:

> The *Burns* sentence implies that when a new employer hires only part of the old unit, together with others who were never part of the unit, any decision regarding the employer's duty to bargain with the union affects the new employer, the old employees whom he has hired, and the new employees who were not previously represented by the union. The rights of all three must be considered. Basic to this consideration is § 9(a) of the Act, . . . which places in the hands of the majority of the employees in the unit the decision whether to be represented or not by the union. That majority's right is paramount. The "full complement" standard of *Burns* attempts to define when the make-up of the controlling majority is to be determined.

Compare note 29 *supra* and accompanying text.

**48.** In *Spruce Up,* the Board did not read *Burns* as restricting bargaining to only those situations in which employees are affirmatively led to expect continuation of existing employment terms. Rather, by the Board's interpretation, initial-terms bargaining is mandatory in "circumstances in which the new employer has either actively or, by tacit inference, misled employees into believing they would all be retained without change in their wages, hours, or conditions of employment, [citing *Howard Johnson Co.,* 198 N.L.R.B. 763 (1972); *Good Foods Mfg. & Processing Corp.,* 200 N.L.R.B. 623 (1972)] *or* [in] circumstances where the new employer . . . has failed to clearly announce its intent to establish a new set of conditions prior to inviting former employees to accept employment." *Spruce Up Corp., supra* note 21, 209 N.L.R.B. at 195 (emphasis supplied). See also *Nazareth Regional High School, supra* note 40; *C.M.E., Inc., supra* note 40.

conditions will be comparable to those in force.

■ The Board was hardly at liberty to ignore these concerns, and its construction of *Burns* is responsive to them. On the one hand, incumbents informed of the availability of employment with the successor entity but contemporaneously notified of substantial changes in the conditions thereof are not lulled into a false sense of security. When, on the other hand, the announcement of job-availability is unaccompanied by any such warning, incumbents may resolve to cast their lot with the successor, secure in the knowledge that they can invoke the aegis of collective bargaining should alterations in the terms of the employment be proposed.[49]

■ Moreover, the Board has observed, a contrary construction of the *Burns* proviso could dissuade successor employers from favorable forecasts on the employment outlook for incumbent employees.[50] It seems rather evident that in some instances a new employer desirous of changing prevailing employment terms may feel compelled to reveal his retention plans, notwithstanding a resultant obligation to bargain. But, in the Board's view, as we understand it, the successor more commonly may endeavor to conceal, or to at least postpone publicity on, reemployment objectives in order to avoid the onus of bargaining during the usually difficult period of takeover, and incumbent employees may thereby be deprived of early appraisal of their retention prospects.[51] Given that, we cannot say that the Board was unreasonable in its stand that reading *Burns* expansively with the object of assuring greater stability for employees might well produce the inverse result.[52]

**49.** When the employment offer and a subsequent announcement of changed terms both occur prior to actual hiring, the announcement could deter some employees from accepting, notwithstanding that it is made some time after the successor first makes known his plan to retain incumbents. If, for example, the successor indicates that he intends to reemploy his predecessor's workforce a month hence, and when employees arrive to submit applications two weeks later he informs them that substantially different terms will be instituted, some incumbents may decide to look for work elsewhere. Nevertheless, a duty to bargain with respect to the proposed changes could possibly be properly imposed on either of two grounds. For lack of sufficient time to rearrange their affairs, incumbents might be forced to continue in the jobs they held under the successor employer, notwithstanding notice of diminished terms, and perpetuation of the workforce—and as well the representational status of the incumbent union—may be assured. Even were that less plain, a bargaining obligation may be essential to protect the employees from imposition resulting from lack of prompt notice. Thus a prospective employment relationship may be presumed when a successor has boldly declared an intention to retain incumbents but has not concurrently proposed substantially reduced benefits. And such an inference may be left undisturbed by revelation of employment terms after the employer's initial announcement but before actual hiring commences. The successor would have no legitimate complaint about mandatory bargaining in such circumstances because its necessity is a product of his own misleading conduct.

**50.** *Spruce Up Corp., supra* note 21, 209 N.L.R.B. at 195.

**51.** See *id.*

**52.** Significantly, nonapplicability of the *Burns* exception does not substantially impair the ability of incumbent employees to ensure suitable terms for the successor employment. Once incumbents are actually *rehired* in sufficient number to constitute a majority of the successor's employees, their organizational representative is then in position to insist that the employer bargain with respect to the conditions of the new employment; as in *Burns* the Court observed, "Burns had an obligation to bargain with the union concerning wages and other conditions of employment when the union requested it to do so." See text *supra* at note 27. And that obligation would arise immediately upon completion of hiring, notwithstanding that operations have not yet commenced. The employer would be free, however, to impose the terms he originally envisioned after consulting in good faith with the union. Thus the *Burns* Court remarked:

If the union had made a request to bargain after Burns had completed its hiring and if Burns had negotiated in good faith and had made offers to the union which the union rejected, Burns could have unilaterally initiated such proposals as the opening terms and conditions of employment on July 1 [the first day of operations] without committing an unfair labor practice. Cf. *NLRB v. Katz*, 369 U.S. 736 n.12, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *NLRB v. Fitzgerald Mills Corp.*, 313 F.2d 260, 272–273 (CA2) cert. denied, 375

## V

We are constrained, then, to sustain the Board in its conclusion that a successor employer need consult with an incumbent union with respect to initial employment terms prior to fixing them only when he has not evinced any intention substantially to modify the pre-existing terms before expressing a willingness to rehire incumbents. We are persuaded, too, that the Board's construction of *Burns* was applied properly to the situation at bar. From the outset, Boeing's decision to retain TWA employees was inseparable from its decision to cling to a scale of diminished wages and benefits. Indeed, Boeing's contract bid to NASA was premised importantly on labor costs reflecting a reduction in the rate of remuneration earned under its predecessor's regime, and all concur that the terms Boeing stipulated fell appreciably short of those prevailing under TWA's auspices. Moreover, Boeing's inability to attract enough incumbents to comprise a majority of the new workforce tellingly evidences the inhibitive effect of the reemployment terms.[53]

On these facts, the Board could reasonably determine that Boeing lacked a sufficiently clear retention plan to activate the *Burns* exception. It follows that Boeing's failure to negotiate with IAM over initial employment terms did not trespass upon the statutory obligation "to bargain collectively with the representatives of [Boeing's] employees."[54] The order of the Board dismissing the General Counsel's complaint must accordingly be

*Affirmed.*

---

U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963); *NLRB v. Southern Coach & Body Co.*, 336 F.2d 214, 217 (CA5 1964).

406 U.S. at 295, 92 S.Ct. at 1586, 32 L.Ed.2d at 77. But absent a bargaining demand by the union, the successor can simply institute the terms on which the employees were hired as the beginning terms of employment, as was the situation in *Burns*.

The *Burns* exception concerns only the period prior to actual hiring. The thrust of the exception, as construed by the Board, is to forestall unilateral designation of initial terms only when it seems clear that the predecessor's employees will be retained or when necessary to safeguard employer-generated expectations that incumbents will be rehired on terms comparable to those already in vogue. See text *supra* at notes 41–43. It should be evident that a bypass of initial-terms bargaining consistent with the Board's reading of *Burns* does not lock indefinitely the carried-over workers into conditions not to their liking. Though *Burns* affords successor employers appreciable freedom in effectuating the successorship transition, the initial adjustment of rights between the employer and incumbents is largely temporal, and if incumbents are retained they can at that point endeavor collectively to improve their lot.

**53.** The administrative record discloses that incumbents declined employment with Boeing because of the proposed reduction in wages. *Boeing Co., supra* note 2, 214 N.L.R.B. at 561 n.62 (decision of administrative law judge).

**54.** § 8(a)(5), 29 U.S.C. § 158(a)(5) (1970).