**U.S. MARINE CORPORATION and Bayliner Marine Corporation, Petitioners/Cross–Respondents,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner,**

**International Union, Allied Industrial Workers of America, AFL–CIO, et al., Intervening Respondent.**

**INTERNATIONAL UNION, ALLIED INDUSTRIAL WORKERS OF AMERICA, AFL–CIO, et al., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 89–2051, 89–2140 and 89–2152.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 5, 1989.

Decided Oct. 18, 1990.

Reheard En Banc June 11, 1991.

Decided Sept. 25, 1991.

Fred G. Groiss, Quarles & Brady, Milwaukee, Wis., James D. Holzhauer (argued), Mayer, Brown & Platt, Chicago, Ill., for petitioners/cross-respondents.

Kenneth R. Loebel (argued), Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, Milwaukee, Wis., for intervening respondent, petioner.

Steven B. Goldstein, Contempt Litigation Branch, Washington, D.C., Fred G. Groiss, Quarles & Brady, Milwaukee, Wis., Aileen A. Armstrong, Linda J. Dreeben (argued), Appellate Court, Enforcement Litigation, Washington, D.C., Joseph A. Szabo, Director, N.L.R.B., Region 30, Milwaukee, Wis., James D. Holzhauer (argued), Mayer, Brown & Platt, Chicago, Ill., for respondent.

Before BAUER, Chief Judge, and CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

U.S. Marine Corporation, Bayliner Marine Corporation, and the International Union, Allied Industrial Workers of America, AFL–CIO, seek review of an order of the National Labor Relations Board (the Board); the Board seeks enforcement of that order. For the following reasons, we deny the petitions for review and enforce the order.

## I

## BACKGROUND

### A. *The Board's Findings of Fact* [1]

This successorship case involves the rights and responsibilities of U.S. Marine Corporation and its parent company, Bayliner Marine Corporation, as a result of their purchase of Chrysler Marine Corporation. The issues presented on appeal require a plenary statement of the facts. To

---

1. Following a "careful[ ] examin[ation of] the record," the Board adopted the Administrative Law Judge's (ALJ's) findings of fact and credibility determinations. Board Decision and Order (D & O) at 1 n. 1.

facilitate the reader's understanding of the factual background of the case, we shall subdivide our presentation of the facts into three headings: (1) the purchase by Bayliner; (2) the hiring process of U.S. Marine; and (3) the post-purchase labor-management relations of U.S. Marine and the Union. However, we also forewarn the reader that, at a later point in the analysis, a strict chronological understanding of events, necessarily sacrificed somewhat by the format described, will be necessary.

### 1. The purchase by Bayliner

Chrysler Marine Corporation (Chrysler), a subsidiary of the Chrysler Corporation, manufactured marine and industrial engines from 1965 until 1984 at a facility in Hartford, Wisconsin. In 1983, the parent company decided to sell Chrysler and entered into negotiations with Bayliner Marine Corporation (Bayliner) for the sale of the Hartford facility. Chrysler and Bayliner signed a letter of intent, subject to the negotiation of specific terms, on October 20, 1983. In anticipation of the transaction, the stockholders and directors of Bayliner organized U.S. Marine Corporation on December 5, 1983 as a vehicle to purchase Chrysler.[2] James W. Hoag, Bayliner's vice-president of administration, was assigned to be general manager and chief operations officer of the Hartford plant once the purchase was completed. He also was responsible for hiring new employees to staff the plant.

During the time that Chrysler owned the Hartford facility, the International Union, Allied Industrial Workers of America, AFL–CIO, and Local 879 (the Union) represented Chrysler's production and maintenance employees.[3] The fate of these employees was a significant issue throughout the course of negotiations between Chrysler and U.S. Marine. Chrysler repeatedly sought assurances that U.S. Marine would hire Chrysler's employees. However, U.S. Marine made it clear to the Union, Chrysler, and Chrysler's employees that it (1) would hire only the most qualified applicants, irrespective of whether they formerly worked for Chrysler, although former Chrysler workers were encouraged to apply, (2) anticipated hiring at least eighty-five per cent of the former Chrysler employees, (3) would not recognize the Union, and (4) planned to hire its employees under its own wage plan and working conditions and therefore would not observe the terms and conditions of employment in effect under Chrysler. James Hoag specifically advised several Union officials at a meeting on December 13, 1983 that he "had no intention of recognizing the union," "wanted no part of the contract [between Chrysler and the Union]," and "was too busy to sit down and meet with the union." Tr. at 691, 692.

The Union reacted to this information by seeking to enjoin the sale of Chrysler to U.S. Marine. The Union sought the injunction on the ground that the sale would violate the Union's collective bargaining agreement, which required Chrysler to give the Union six months notice of the closing of the Hartford facility and negotiate a severance pay plan. *See Local 879, Allied Indus. Workers v. Chrysler Marine Corp.*, 819 F.2d 786, 787 (7th Cir.1987). On December 27, 1983 and in response to the lawsuit, Chrysler's associate general counsel requested J. Orin Edson, who was Bayliner's chairman and U.S. Marine Corporation's president, to testify or file an affidavit that U.S. Marine Corporation would hire a majority of the Chrysler employees. Mr. Edson refused, indicated that the company would not make a commitment regarding hiring, and in fact expected to hire less than fifty per cent of the Chrysler workers. Although Mr. Edson refused to accede to

---

**2.** Bayliner is owned by J. Orin Edson (chairman), Vinton H. Sommerville (president), David Livingston (vice-president), and Donald Saunders (secretary-treasurer). U.S. Marine Corporation is also owned by J. Orin Edson (president), Vinton H. Sommerville (treasurer), David Livingston (vice-president), and Donald Saunders (secretary). Unless the context requires otherwise, Bayliner and U.S. Marine Corporation will be referred to collectively as U.S. Marine.

**3.** The most recent collective bargaining agreement between the Union and Chrysler was in effect from July 1, 1983 to June 30, 1984.

Chrysler's request, he authorized Mr. Hoag to file an affidavit. In his affidavit of December 28, 1983, Mr. Hoag stated that (1) U.S. Marine had begun accepting applications and expected to have a representative complement of employees hired by early January, 1984, (2) applicants would be considered based on their relative qualifications, (3) union membership (or the lack thereof) would not enter into the hiring decision, (4) he believed a number of applicants would be former Chrysler employees and that such prior experience would be advantageous, and (5) applicants would receive an explanation of the terms and conditions of employment prior to being hired. The district court granted a preliminary injunction, but this court granted a stay on January 9, 1984 and eventually reversed the injunction on May 31, 1984. After the injunction was lifted, the transfer of the facility was finalized. On Friday, January 13, 1984, Chrysler completed the sale to U.S. Marine, laid off its entire work force of 262 production and maintenance employees, and closed its doors.

2. The hiring process of U.S. Marine

From Monday, January 16 through Friday, January 20, the company interviewed some 500 applicants and hired new employees. On January 20, after the first week of hiring was completed, the company's accounting department projected that U.S. Marine would require 396 employees actually on the job by June. This figure was based on information supplied by the company's manufacturing and marketing departments and did not reflect anticipated absentee rates. According to John Lombardo, U.S. Marine's human resources manager, U.S. Marine wanted to reopen the plant as quickly as possible. He further testified that in order to do so, the company required a skilled labor force composed of employees who had experience in the

particular operations. Consequently, on Monday, January 23, U.S. Marine reopened the plant with a staff of 219 workers, all of whom were former Chrysler employees.

U.S. Marine continued to hire employees throughout the month of January. By January 25, the company had hired a total of 231 workers, 222 of whom were former Chrysler employees. Between January 25 and January 30, thirty more employees were hired, only one of whom had worked for Chrysler. Thus, on January 30, 1984, the last day a former Chrysler employee was hired, the U.S. Marine work force was composed of 261 production and maintenance employees, 223 of whom had worked previously for Chrysler.

Nearly all of the 262 former Chrysler workers had applied with U.S. Marine; of those who applied, U.S. Marine hired all but thirty-four.[4] There was a great deal of testimony concerning the skill level and versatility of the thirty-four former Chrysler employees not hired by U.S. Marine.[5] All of these workers had at least ten years seniority with Chrysler, but they never were informed why they had not been hired. After January 30, 1984, U.S. Marine did not hire any of the remaining Chrysler applicants, although its work force increased to as many as 323 employees. In sum, from January 23 to August 31, 1984, U.S. Marine's total employment ranged from 219 to 323 production and maintenance employees. During that time period, the number of former Chrysler employees ranged from 218 to 223.

3. Post-purchase labor-management relations of U.S. Marine and the Union

After it began operating the plant, U.S. Marine refused to discuss grievances with Union representatives during company time. The company also removed Union bulletin boards from the plant. At the

---

**4.** Of the 262 former Chrysler employees, 258 applied for jobs with U.S. Marine. Of those 258 applicants, 223 were hired and 35 were rejected. In February 1985, one applicant died, leaving 34 predecessor employees at issue.

**5.** The ALJ heard testimony from 12 of the 34 former Chrysler employees. Following the tes-

timony of the twelfth witness and in the absence of any objection, the ALJ concluded that the remaining 22 witnesses also would testify that they had good work records and were versatile employees. The ALJ invited rebuttal from U.S. Marine on the issue and declined to take further testimony from the remaining witnesses.

same time, the company established a "Safety and Progress Committee" composed of senior management employees and representatives from each work area. The Committee was designed as an open forum where employees could raise complaints and discuss all problems or areas in need of change; no subject was off-limits for discussion. The Committee met during work hours, and employee participants were paid for their time.

On January 25, 1984, two days after the plant began operations under new management, at a time when 222 of the 231 U.S. Marine employees were former Chrysler workers, the Union requested recognition. The Union also asked that U.S. Marine furnish a list of names, addresses, job titles, and wage rates of all U.S. Marine employees and copies of all written manuals and handbooks describing the benefits then provided by U.S. Marine. The company, which was still involved in the hiring process, did not give the Union an immediate response.

On or shortly after January 31, 1984, after the Union had requested recognition and after the last Chrysler employee was hired, Mr. Hoag personally modified the accounting department's manpower projection figure from 396 to 460 workers required by June. This modification allegedly was based on an increased production schedule and the absenteeism rate experienced by Chrysler in 1983. Before determining the manpower projection, however, Mr. Hoag increased the company's estimated production schedule by forty engines for May of 1984 and ninety engines for June. He was unable to explain the basis of this increase. Moreover, the absentee rate used by Mr. Hoag reflected the fact that Chrysler employees would have been entitled to lengthy paid vacations; in 1984, U.S. Marine employees would not have been entitled to any paid vacation.[6]

When the company had not yet responded to the Union's recognition request on February 2, 1984, the Union filed an unfair labor practice charge alleging that U.S. Marine unlawfully had refused to bargain. The Board subsequently sought a temporary injunction pursuant to section 10(j) of the National Labor Relations Act (the Act), 29 U.S.C. § 160(j). U.S. Marine defended its refusal to recognize and bargain with the Union on the grounds that it did not expect to have a full complement of employees until June 1984, that the full complement would consist of 460 employees, and that there was no legal obligation to recognize the Union because less than half of those 460 were expected to be former Chrysler employees. On May 10, 1984, the district court granted the Board's petition. The court ordered U.S. Marine to recognize and bargain with the Union and to supply the information that the Union had requested on January 25.

Following issuance of the temporary injunction, U.S. Marine continued to hold Safety and Progress Committee meetings and to respond to employee requests stemming from those sessions. Based on this conduct, U.S. Marine was found in contempt of the injunction. *See Szabo v. U.S. Marine Corp.*, 819 F.2d 714 (7th Cir.1987). The company also recognized and began meeting with the Union. Between May 24, 1984 and October 25, 1985, U.S. Marine and Union officials met a total of nineteen times. U.S. Marine refused to conduct these bargaining sessions at the facility or on company time. As a result, the meetings took place after work hours at the Union headquarters, located approximately forty minutes from the plant. On October 25, 1984, U.S. Marine presented a contract proposal to the Union. The Union rejected the proposal, at which point U.S. Marine declared that it was at an impasse with the Union on several issues. The Union objected, stated that it wanted to negotiate further, and suggested meeting with a mediator. Mr. Hoag declined that invitation on behalf of the company. No further meetings took place between U.S. Marine and the Union, although the Union requested bargaining over holiday layoffs. On Janu-

---

**6.** A subsequent projection, prepared by U.S. Marine's accounting department on February 15, 1984, took into consideration an expected ab-

sentee rate lower than that used by Mr. Hoag. This schedule indicated that U.S. Marine would require only 380 employees by June of 1984.

ary 21, 1985, U.S. Marine implemented the contract it had proposed to the Union on October 25, 1984. A pay raise was included within that contract.

## B. *Administrative Proceedings*

### 1. The Administrative Law Judge's conclusions

Based on these facts, the Administrative Law Judge (ALJ) determined that Bayliner and U.S. Marine Corporation constitute a single employer and that U.S. Marine, as the successor to Chrysler, had engaged in numerous unfair labor practices. Specifically, the ALJ concluded that the company violated section 8(a)(5) and (1) of the Act (29 U.S.C. § 158(a)(5) and (1)) by refusing to recognize the Union, refusing to furnish the Union with certain information, bargaining in bad faith with the Union, unilaterally implementing changes in terms and conditions of employment without first bargaining in good faith with the Union, bargaining individually with employees, and establishing and bargaining with the Safety and Progress Committee.

With regard to the charge that U.S. Marine had violated section 8(a)(3) and (1) of the Act (29 U.S.C. § 158(a)(3) and (1)) by refusing to hire thirty-four of the former Chrysler workers, the ALJ determined that these applicants had not been subjected to discrimination. In the ALJ's view, even considering the company's established anti-union animus and the fact that no former Chrysler employees were hired after January 30, 1984, nothing in the evidence indicated why those applicants had not been hired. The ALJ reasoned that the demonstrated unfair labor practices could support a section 8(a)(3) violation if there was a

"junction point" between U.S. Marine's hostility to the Union and the company's hiring process. The ALJ was unable to find such an intersection and therefore found that the evidence did not support the unfair labor practice charge.

The ALJ apparently reasoned that the section 8(a)(3) charge could be supported only by a finding that Mr. Hoag accepted the 460 manpower figure as a real goal; if Mr. Hoag so believed, he then would be motivated to stop hiring former Chrysler employees so that the U.S. Marine work force consisted of a non-union majority. However, the ALJ already had concluded that Mr. Hoag did not truly believe the 460 manpower projection figure and that, consequently, Mr. Hoag would have no incentive for refusing to hire additional Chrysler employees. Therefore, in light of what the ALJ believed was an "inherent conflict," and, in the absence of substantive evidence of the company's motivation, the ALJ declined to hold that U.S. Marine's hiring decisions were motivated by antiunion animus or the desire to avoid a duty to bargain.

Having found that U.S. Marine violated section 8(a)(5) and (1), as set forth above, the ALJ recommended that the company be ordered to cease and desist from unilaterally changing the terms and conditions of employment without first bargaining with the Union, bargaining individually with employees, and bargaining or meeting with the Safety and Progress Committee. The ALJ also recommended that the company be ordered to recognize and bargain with the Union and furnish the Union with certain information. Finally, the ALJ's recommended order included a visitorial clause.[7]

---

**7.** Such clauses "permit the Board to examine the books and records of a respondent and to take statements from its officers and employees and others for the purpose of determining or securing compliance with a court-enforced order." *Cherokee Marine Terminal,* 287 N.L.R.B. No. 53, 128 L.R.R.M. (BNA) 1051, 1052 (1988). The ALJ's recommended visitorial clause in this case read as follows:

For the purpose of determining or securing compliance with this Order, the Board, or any of its duly authorized representatives, may obtain discovery from Respondents, their offi-

cers, agents, successors or assigns, or any other person having knowledge concerning any compliance matter, in the manner provided by the Federal Rules of Civil Procedure. Such discovery shall be conducted under the supervision of the United States Court of Appeals enforcing this Order and may be had upon any matter reasonably related to compliance with this Order, as enforced by the Court.

Administrative Law Judge's Decision (ALJD) at 35.

## 2. The Board's conclusions

The Board unanimously affirmed the ALJ's conclusion that U.S. Marine committed the enumerated section 8(a)(5) violations. The Board also upheld the ALJ's determination that James Hoag falsely inflated U.S. Marine's employee projections. However, contrary to the ALJ's finding, the Board concluded that U.S. Marine violated section 8(a)(3) of the Act by failing to hire thirty-four former Chrysler employees. The ALJ had been unable to find a nexus between the company's antiunion animus and its failure to hire these applicants. The Board, however, found that the requisite nexus lay in the fact that "[t]he end sought to be achieved by the false 'full complement' figure," evasion of a bargaining obligation as Chrysler's successor, "would be frustrated if the former Chrysler employees constituted more than half of that figure." Board Decision & Order (D & O) at 7–8. Once the manpower projection falsely was set at 460,

> it became imperative that [U.S. Marine] hire fewer than 231 former Chrysler employees, or the 460 figure would become meaningless as a defense to the Union's recognitional claim. Thus, the sham inflation of the full-complement projection and the decision to stop rehiring former Chrysler employees once their number had reached 223 are complementary aspects of the same scheme sought to be carried out by U.S. Marine.

*Id.* at 5–6. The Board noted that the ALJ's failure to find a section 8(a)(3) violation was based on the ALJ's mistaken assumption that Mr. Hoag would "proffer the 460 figure as a defense to recognition, and then not take this figure into account in making his hiring decision." *Id.* at 8. Accordingly, the Board concluded that U.S. Marine refused to hire the Chrysler applicants in an unlawful attempt to avoid a bargaining obligation.

With regard to the remedy, the Board accepted the ALJ's recommendations with the exception of the visitorial clause. The Board's order did not include such a clause. It acknowledged the ALJ's recommendation but summarily rejected it, stating, "[w]e find no need for such a remedial provision here. *See Cherokee Marine Terminal,* 287 NLRB No. 53 (Jan. 28, 1988)." D & O at 13 n. 14. In addition to the ALJ's recommendations, the Board ordered U.S. Marine to preserve and make available all records necessary to analyze the amount of back pay due. The Board also ordered the company to reimburse employee members of the Union's negotiating committee for wages lost while attending negotiating sessions. The Board did not address the Union's additional requests for legal costs and referral of the case to the Justice Department.

The most significant difference between the Board's order and the ALJ's recommended order was based on the Board's conclusion that U.S. Marine unlawfully refused to hire thirty-four former Chrysler employees. To remedy that conduct, the Board modified the ALJ's decision and ordered the company to offer employment, with back pay and benefits, to those thirty-four applicants. Over one dissent, the Board also directed U.S. Marine to reinstate the terms and conditions of employment that were in effect under Chrysler's management of the Hartford facility.[8]

## II

### ANALYSIS

#### A. *Standard of Review*

■ We have jurisdiction to hear this appeal pursuant to 29 U.S.C. § 160(e), (f). Our standard of review is governed by statute and set forth in 29 U.S.C. § 160(e). Specifically,

> [o]n review, the Board's factual findings are 'conclusive' if they are supported by 'substantial evidence on the record as a whole.' Section 10(e) of the Act, 29 U.S.C. § 160(e). The Board's application of the law to particular facts is also reviewed under the substantial evidence

---

8. Because NLRB Member Cracraft concluded that this issue was not fully litigated, she dissented, on due process grounds, from the decision to reinstate the previous terms and conditions of employment.

standard, and the Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion had it considered the matter *de novo.*

*Indianapolis Power & Light Co. v. NLRB,* 898 F.2d 524, 529 (7th Cir.1990); *see also NLRB v. United Ins. Co.,* 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). "This standard of review is not modified in any way when the Board and the ALJ disagree as to legal issues or derivative inferences made from the testimony." *Weather Shield Mfg., Inc. v. NLRB,* 890 F.2d 52, 57 (7th Cir.1989). It is the independent validity of the Board's order that is under review. *Id.* We emphasize that, on review, the court may not displace the Board's determinations simply because a different conclusion could be reached if the court reviewed the case *de novo.* *United Ins. Co.,* 390 U.S. at 260, 88 S.Ct. at 991; *Lapham–Hickey Steel Corp. v. NLRB,* 904 F.2d 1180, 1184 (7th Cir. 1990).

■■■ "Moreover, we must 'recognize the Board's special function of applying the provisions of the Act to the complexities of industrial life.' " *Id.* (quoting *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 236, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963)). We must remember that Congress has charged the Board with "the task of devising remedies to effectuate the policies of the Act." *NLRB v. Seven–Up Bottling Co.,* 344 U.S. 344, 346, 73 S.Ct. 287, 289, 97 L.Ed. 377 (1953); *see* 29 U.S.C. § 160(c). Thus, " '[i]t is for the Board, not the courts, to determine how the effect of prior unfair labor practices may be expunged.' " *Franks Bros. Co. v. NLRB,* 321 U.S. 702, 704, 64 S.Ct. 817, 818, 88 L.Ed. 1020 (1944) (quoting *International Ass'n of Machinists v. NLRB,* 311 U.S. 72, 82, 61 S.Ct. 83, 89, 85 L.Ed. 50 (1940)). The Board's authority to fashion remedies "is a broad discretionary one, subject to limited judicial review." *Fibreboard Paper Prods. Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964). Courts may not disturb the Board's remedial order

" 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' " *Id.* (quoting *Virginia Elec. & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943)); *accord NLRB v. Manitowoc Eng'g Co.,* 909 F.2d·963, 970 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991). The faithful application of these principles requires a great deal of judicial restraint. We must accept as a "given" the economic and social policy choices made by Congress in enacting the National Labor Relations Act. We must acknowledge that Congress has decided to vest primary responsibility for the implementation of that policy in the NLRB and not in this court.

**B.** *Issues Presented*

As a threshold matter, we also state what is ... and what is not ... contested in this appeal. U.S. Marine does not appeal the Board's determinations that

 (1) U.S. Marine Corporation and Bayliner constitute a single employer,

 (2) U.S. Marine is a successor employer to Chrysler,

 (3) U.S. Marine violated section 8(a)(5) and (1) of the Act by

 (a) refusing to recognize and furnish certain information to the Union,

 (b) failing to bargain in good faith with the Union,

 (c) unilaterally implementing changes in terms and conditions of employment,

 (d) bargaining individually with employees, and

 (e) establishing and bargaining with an employer-dominated labor organization (the Safety and Progress Committee).

Accordingly, the Board's order with respect to these issues is enforced. *See Montgomery Ward & Co. v. NLRB,* 668 F.2d 291, 304 (7th Cir.1981) (uncontested violations of the Act summarily enforced); *Justak Bros. & Co. v. NLRB,* 664 F.2d 1074, 1076 (7th Cir.1981) (same). We also note that these uncontested violations "do not disappear by

not being mentioned in a brief. They remain, lending their aroma to the context in which the [remaining] issues are considered." *NLRB v. Clark Manor Nursing Home Corp.,* 671 F.2d 657, 660 (1st Cir. 1982).

Before this court, the company challenges the Board's conclusion that U.S. Marine violated the Act by refusing discriminatorily to hire thirty-four former Chrysler employees. The company also challenges the Board's order that U.S. Marine remedy this violation by offering to hire the thirty-four former Chrysler employees with back pay. Finally, the company contests the Board's order that U.S. Marine reinstitute the terms and conditions of employment that were in effect under Chrysler. We examine whether the Board's conclusions on these issues are supported by substantial evidence. We also consider the Union's claims concerning the appropriateness of the Board's remedial order.

### C. *Hiring of Former Chrysler Employees*

 We begin by reviewing the Board's determination that U.S. Marine violated section 8(a)(3) and (1) of the Act by refusing to hire thirty-four former Chrysler employees. In order to prove a violation of the Act, the Board's General Counsel must establish, by a preponderance of the evidence, that the alleged unfair labor practice was motivated by antiunion sentiment. *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 398–99, 401, 103 S.Ct. 2469, 2472–73, 2474, 76 L.Ed.2d 667 (1983). Motive may be demonstrated by either direct or circumstantial evidence.[9]

As noted above, on review before this court, the Board's conclusion that an employer acted with a discriminatory motive is conclusive if supported by substantial evidence. Once it is shown that antiunion animus was a motivating factor in the employer's conduct, the employer will be held to have violated the Act unless it demonstrates, as an affirmative defense, that it would have made the same decisions even absent the prospective employee's union activities. *Id.* at 401–03, 103 S.Ct. at 2474–75.[10]

██ ██ The basic applicable substantive principles of federal labor law are beyond dispute. When a new employer acquires a business, it is free, as a general rule, to determine the initial terms and conditions of employment. *NLRB v. Burns Int'l Sec. Servs.,* 406 U.S. 272, 287–88, 92 S.Ct. 1571, 1582–83, 32 L.Ed.2d 61 (1972). Nevertheless, if the new employer continues the predecessor's business in substantially unchanged form, and if a majority of the work force was formerly employed by the predecessor, the successor has an obligation "to bargain with the union that represented those employees." *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 47, 107 S.Ct. 2225, 2238, 96 L.Ed.2d 22 (1987). Although there is no obligation to hire the predecessor's employees, a successor violates section 8(a)(3) of the Act if it makes discriminatory hiring decisions and refuses to employ its predecessor's employees in order to avoid incurring a bargaining obligation. *See id.* at 40, 107 S.Ct. at 2234; *Howard Johnson Co. v. Detroit Local Joint Executive Bd., Hotel & Restaurant Employees,* 417 U.S. 249, 262 n. 8,

---

**9.** *See NLRB v. Link–Belt Co.,* 311 U.S. 584, 602, 61 S.Ct. 358, 367, 85 L.Ed. 368 (1941) (Board properly relied on circumstantial evidence of discrimination; lack of direct evidence of employer's discriminatory motive did not require denial of relief); *NLRB v. Rich's Precision Foundry, Inc.,* 667 F.2d 613, 626 (7th Cir.1981) ("Motivation is a question of fact to be determined by the Board from consideration of all the evidence and in making this determination the Board is free to rely on circumstantial, as well as direct evidence.").

**10.** This test concerning the respective burdens of proof in a labor case was developed by the

Board in *Wright Line,* 251 N.L.R.B. 1083 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). In *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), the Supreme Court approved this formula. U.S. Marine claims that the Board misapplied the *Wright Line* test because: (1) the Board's General Counsel failed to establish a *prima facie* case, and (2) assuming *arguendo* that the General Counsel succeeded in making a case, U.S. Marine met its burden of rebuttal.

94 S.Ct. 2236, 2243 n. 8, 41 L.Ed.2d 46 (1974); *Burns,* 406 U.S. at 280 n. 5, 92 S.Ct. at 1578 n. 5; *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 182–87, 61 S.Ct. 845, 846–49, 85 L.Ed. 1271 (1941).

■ The Board determined that U.S. Marine refused to hire thirty-four of Chrysler's former employees in order to avoid having to bargain with the Union. Accordingly, the Board concluded that the company had violated section 8(a)(3) of the Act. In reaching this conclusion, the Board employed the analytical pattern set forth in *Dasal Caring Centers,* 280 N.L.R.B. 60, 69 (1986), *enforced without opinion,* 815 F.2d 711 (8th Cir.1987). Despite its overlapping inquiries, this approach can serve as a useful guide in determining whether a successor employer has engaged in discriminatory hiring practices designed to avoid the obligation to bargain with an incumbent union:

> it must be established that there is substantial evidence of union animus; lack of a convincing rationale for refusal to hire the predecessor's employees; inconsistent hiring practices or overt acts or conduct evidencing a discriminatory motive; as well as a reasonable inference from the evidence that Respondent conducted its staffing in a manner precluding the predecessor's employees from being hired as a majority of Respondent's overall work force to avoid the Board's successorship doctrine.

*Id.* In this appeal, it is our duty, as we have noted already, not to determine this matter *de novo* but to decide whether the Board's conclusion is supported by substantial evidence on the record taken as a whole. *See supra* pp. 1313–14. In reviewing the Board's conclusion, we shall follow the analytical pattern developed in *Dasal Caring Centers*—not as a rigid formula but as a guide to our evaluation of the evidence relied upon by the Board.

**1. Substantial evidence of antiunion animus**

We need to devote little space to this matter. The record amply demonstrates that, from the very beginning of its negotiations with Chrysler for the sale of the business, Bayliner made it clear that it would not deal with the Union. Indeed, the best evidence of antiunion animus on the part of U.S. Marine can be found in the violations of the Act not contested on this appeal. *See supra* p. 1314.

**2. Lack of convincing rationale for refusal to hire the predecessor's employees**

The record establishes, as the ALJ determined and the Board upheld, the absence of any legitimate reason for U.S. Marine's refusal to hire thirty-four former Chrysler employees. Based on the testimony, the ALJ determined that the applicants who were turned down were good employees, were versatile and skilled in various jobs at the plant, had worked at the plant a minimum of ten years, and had work-related characteristics comparable to the 223 former Chrysler employees who were hired. Nevertheless, they were rejected while more than one hundred other applicants were hired; U.S. Marine was unable to explain these rejections to either the applicants (none was told why he had been passed over) or to the Board. Indeed, " 'there is no substantive evidence of why one person was hired and one was not hired.' " D & O at 7 (quoting Administrative Law Judge's Decision (ALJD) at 22).[11]

**3. Inconsistent hiring practices or overt acts or conduct evidencing a discriminatory motive**

There is substantial evidence, both direct and circumstantial, from which the Board could infer that thirty-four of the applicants were not hired because they were union members who formerly had worked for Chrysler. As a threshold matter, we

---

**11.** U.S. Marine maintains that this finding conclusively precludes any determination that the company discriminated against 34 applicants because they were Union members who formerly worked for Chrysler. The point of this statement, however, is that the company's unlawful scheme to avoid a bargaining obligation was furthered by the refusal to hire some of the former Chrysler employees, not by the refusal to hire those specific applicants.

note that central to this conclusion is the Board's determination that Mr. Hoag falsely inflated the projected work force figures in order to avoid the obligation to negotiate with the Union. The ALJ pointedly noted that the accuracy of the manpower requirement figures relied on by the company to defend its conduct turns

> entirely upon *Hoag's personal credibility.* Hoag is not an engineer, nor a production manager, but a lawyer, involved at Bayliner with human resources and administration, not marketing, sales, or production. As noted, there is no corroborating evidence from Bayliner, or U.S. Marine, or independent sources, of why Hoag decided that 40 additional engines would be built in May of 1984 and 90 more in June.... Further, Hoag's projections on absentee rates ... were manifestly inaccurate. [Based on Hoag's selective memory and inconsistent explanations,] I do not credit Hoag's explanations of his motives in revising the U.S. Marine estimates of production and manpower needs....

ALJD at 17–18 (emphasis supplied). Like the Board, we shall not disturb the ALJ's decision that Mr. Hoag's testimony lacked credibility. *See Roadmaster Corp. v. NLRB,* 874 F.2d 448, 453 n. 4 (7th Cir. 1989). There is more than ample evidence—especially when the entire course of the parties' dealing is analyzed—to support the Board's determination that the company's "central concern was to avoid a bargaining obligation by means of reliance on a false full-complement projection." D & O at 5. Mr. Hoag, who was responsible for hiring U.S. Marine's employees, admitted that he was aware before the hiring process began that any bargaining obligation

turned on whether former Chrysler employees constituted more than half of U.S. Marine's work force; the company—and Mr. Hoag specifically—made clear to the Union, Chrysler, and its employees that the Union would not be recognized and the collective bargaining agreement would not be followed. Although Mr. Hoag originally stated in December of 1983 that the company expected to have a representative complement of workers early in January of 1984, he later altered the manpower figures and thereafter defended U.S. Marine's refusal to recognize the Union on the ground that the Company would not have a full complement of workers until June of 1984.[12] Moreover, the company's president indicated that U.S. Marine expected to hire less than fifty per cent of the former Chrysler workers.[13] This announcement was made before any of the Chrysler employees had been interviewed or considered for employment and was made in conjunction with the company's statement that it would not recognize or bargain with the Union. The company then did refuse to honor the Union's recognition request, based on Mr. Hoag's false projections, in spite of the fact that, from the time U.S. Marine took over the Hartford plant until September 16, 1985, the day the unfair labor practice hearing began, former Chrysler employees always constituted a majority of the U.S. Marine work force. Moreover, after the Union requested recognition and filed the unfair labor practice charge, U.S. Marine continued to hire new employees but declined to hire any of the thirty-four comparably qualified former Chrysler employees. Supported by this evidence and the manner in which Mr. Hoag developed the 460 figure,[14] the Board rea-

---

**12.** *See Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 46–47, 52, 107 S.Ct. 2225, 2236–37, 2240, 96 L.Ed.2d 22 (1987) (successor's duty to bargain is triggered when successor has hired a "substantial and representative complement" of its total work force and a majority of those hired worked for the predecessor).

**13.** Of course, this expectation was not borne out; 98% of the former Chrysler employees applied for a job with U.S. Marine, and the company hired approximately 86% of those who applied.

**14.** As set forth more fully in the statement of the facts, Mr. Hoag modified the employee projection figure based on an increased production schedule and Chrysler's 1983 absenteeism rate. However, without explanation, Mr. Hoag also increased the company's estimated production. Moreover, Mr. Hoag used an absentee rate that was based on Chrysler's benefits plan, a plan that obviously did not apply to U.S. Marine employees.

sonably could conclude that there was anti-union animus and that Mr. Hoag was motivated by a desire to furnish U.S. Marine with a defense to the Union's recognition request.

### 4. Intent to avoid the successorship doctrine

The last part of the *Dasal* analysis—necessarily cumulative of the first three inquiries—focuses on whether the Board reasonably could infer that U.S. Marine conducted its hiring process to preclude Chrysler's employees from being hired as a majority of the overall work force in order to avoid a bargaining obligation as Chrysler's successor. U.S. Marine maintains that "no unlawful purpose would have been served by not hiring 34 of the former Chrysler employees." Appellants' Br. at 19. To the contrary, once the manpower projection falsely was set at 460,

> it became imperative that [U.S. Marine] hire fewer than 231 former Chrysler employees, or the 460 figure would become meaningless as a defense to the Union's recognitional claim. Thus, the sham inflation of the full-complement projection and the decision to stop rehiring former Chrysler employees once their number had reached 223 are *complementary aspects of the same scheme* sought to be carried out by U.S. Marine.

D & O at 5–6 (emphasis supplied). Accordingly, the unlawful purpose of avoiding a bargaining obligation could have been served *only* by not hiring more of the Chrysler applicants: to maintain a colorable defense against the Union's request for recognition, U.S. Marine had to keep the number of Chrysler workers at less than fifty per cent of its anticipated work force. *See Fall River Dyeing*, 482 U.S. at 46–47, 107 S.Ct. at 2237–38; *Burns*, 406 U.S. at 277–81, 92 S.Ct. at 1576–79. Thus, in light of the evidence regarding the company's antiunion animus, it was permissible for the Board to conclude that U.S. Marine conducted the hiring process in a manner

designed to preclude Chrysler's employees from being hired as a majority in order to avoid a bargaining obligation. *See NLRB v. Rich's Precision Foundry, Inc.*, 667 F.2d 613, 626 (7th Cir.1981) (Board properly relied on employer's manifest hostility toward unionization combined with knowledge of employee's union activity to support finding of section 8(a)(3) violation).

U.S. Marine contends that the Board erred in finding a section 8(a)(3) violation. The company argues that it is "critical" that the manpower projections were not altered by Mr. Hoag until *after* the thirty-four former Chrysler employees' applications had been rejected. Appellants' Br. at 19–20. However, Mr. Hoag and Joy Mueller, U.S. Marine's employment supervisor, testified that the thirty-four applicants were not in fact rejected but remained under consideration throughout the hiring process.[15] More fundamentally, the company's reliance on this point is misplaced because the sequence of Mr. Hoag's manipulation of the manpower figure and the decision to stop hiring former Chrysler employees is largely irrelevant. There is substantial evidence that U.S. Marine's desire to avoid a bargaining obligation predated its purchase of the plant. If the employee projections had been made earlier in the hiring process, the goal of keeping former Chrysler workers at less than half of the total U.S. Marine work force still could have been reached by refusing employment to a greater number of the Chrysler applicants. Consequently, the fact that Mr. Hoag inflated the figure *after* he knew that the rather disorganized hiring process had resulted in 223 former Chrysler workers having been hired—and therefore knew that the employee projection had to be at least 447 (twice 223 plus one)—is not controlling. However, it is chronologically significant that Mr. Hoag altered the manpower projections after the Union had requested recognition.

Although the ALJ was unable to find consistent theories to support both U.S.

---

**15.** Also, applicants who inquired about the status of their applications were told that they were still under consideration, and the Union was informed as late as July of 1984 that the 34

applicants remained under consideration. This is consistent with the applicants' testimony that they never were informed why they had not been hired.

Marine's refusal to recognize the Union and the company's alleged discriminatory hiring practices, the Board reasonably concluded that U.S. Marine's unlawful motivation led to the company's refusal to hire some of the Chrysler applicants. Based on its conclusion that Mr. Hoag falsely inflated the work force requirements and on the other record evidence supporting the conclusion that the purpose of this manipulation was to allow U.S. Marine to avoid a bargaining obligation as Chrysler's successor, the Board's inference—that the thirty-four former Chrysler applicants were not hired in order to keep at less than fifty per cent the number of former Chrysler workers—was both reasonable and supported by substantial evidence. Our task is to determine whether the *Board's* interpretation is supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *Weather Shield Mfg., Inc. v. NLRB*, 890 F.2d 52, 57 (7th Cir.1989). We reiterate that we shall not displace the Board's reasonable inferences simply because the ALJ may have reached a different but justifiable conclusion.[16] *See NLRB v. United Ins. Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968); *Indianapolis Power & Light Co. v. NLRB*, 898 F.2d 524, 529 (7th Cir.1990); *see also Weather Shield*, 890 F.2d at 57 (fact that Board and ALJ disagree as to inferences

drawn from testimony does not alter standard of review).

### D. *The Board's Remedial Order to Restore Terms and Conditions of Earlier Contract*[17]

As we have already noted, but repeat for emphasis, Congress has charged the Board, not the courts, with "the task of devising remedies to effectuate the policies of the Act." *NLRB v. Seven–Up Bottling Co.*, 344 U.S. 344, 346, 73 S.Ct. 287, 288, 97 L.Ed. 377 (1953); *see also supra* pp. 1313–14. With these guiding principles in mind, we consider whether the Board's order is entitled to enforcement.

Based on U.S. Marine's failure to bargain as a successor and its unlawful refusal to hire former Chrysler workers, the Board imposed a "make whole" remedy and ordered the company to reinstate the terms and conditions of employment in effect under Chrysler. In challenging this *status quo ante* remedy, U.S. Marine contends that the Board exceeded its authority and claims that this portion of the order is improperly punitive. For the following reasons, we cannot accept the company's claim.

Under the mandate of *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), a successor employer that does

---

16. We do not disagree with U.S. Marine's contention that "a strong initial decision [by the ALJ] opposite to the Board's decision requires [the court] to consider the evidentiary and analytical basis of the Board's decision with special care." *International Union, UAW v. NLRB*, 802 F.2d 969, 971 (7th Cir.1986); *see also Weather Shield Mfg., Inc. v. NLRB*, 890 F.2d 52, 57 (7th Cir.1989). However, the primary difference between the ALJ and the Board's resolution of the unlawful hiring charge does not rest on credibility determinations, and we find no flaw in the Board's analysis of the issue. The Board did not disturb the ALJ's factual determinations, *see* D & O at 1 n. 1, but rather drew different legal conclusions from the established facts. Because both the facts and the Board's conclusions are supported by substantial evidence, we will not displace them.

17. The Board asserts that we lack jurisdiction over this part of the appeal. Section 10(e) of

the Act (29 U.S.C. § 160(e)) provides that, absent extraordinary circumstances, we may not consider objections that were not presented to the ALJ or Board. The Board argues that our review of this claim is precluded by U.S. Marine's failure to move for reconsideration of the remedial order. We reject the Board's argument. We have noted that section 10(e) serves to (1) ensure that the Board has the opportunity to resolve issues within its jurisdiction, and (2) avoid repetitious appeals to the courts. *NLRB v. Wayne Transp.*, 776 F.2d 745, 748–49 (7th Cir. 1985). "[N]either of these policies would be served by deferral of the issue to another time." *Id.* at 749. First, the Board was put on notice of this matter by the General Counsel and Union's (1) exceptions to the ALJ's recommended bottler, and (2) extensive briefs to the Board. The Board not only had the opportunity to but did resolve the issue. Second, we fail to see how consideration of the company's claims will generate repetitive appeals.

not agree to the substantive terms of a collective bargaining agreement in force between a union and the predecessor generally is not bound to observe those terms. Thus, a successor employer is "ordinarily free to set initial terms on which it will hire the employees of a predecessor." *Id.* at 294, 92 S.Ct. at 1585. However, "there will be instances in which it is perfectly clear that the new employer plans to retain all [18] of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms." *Id.* at 294–95, 92 S.Ct. at 1585–86. Where all or substantially all of the predecessor's employees would have been retained but for the successor's unlawful discrimination, the successor loses the right to set initial terms and conditions of employment and violates the Act if it unilaterally alters the predecessor's terms without first consulting the union. In such cases, the Board may impose a *status quo ante* remedy to restore the situation to what it would have been absent the successor's unfair labor practices. *See Systems Management, Inc. v. NLRB,* 901 F.2d 297, 306–07 (3d Cir.1990), *enforcing in relevant part* 292 N.L.R.B. No. 125, 131 L.R.R.M. (BNA) 1729 (1989); *NLRB v. Shortway Suburban Lines, Inc.,* 862 F.2d 309 (3d Cir.1988), *enforcing without opinion* 286 N.L.R.B. 323 (1987); *American Press, Inc. v. NLRB,* 833 F.2d 621, 624–25 (6th Cir.1987), *enforcing in relevant part* 280 N.L.R.B. 937 (1986); *Kallmann v. NLRB,* 640 F.2d 1094, 1102–03 (9th Cir.1981), *aff'g in part Love's Barbeque,* 245 N.L.R.B. 78 (1979); [19] *NLRB v. Potter's Drug Enters., Inc.,* 584 F.2d 980 (9th Cir.1978), *enforcing without opinion* 233 N.L.R.B. 15 (1977); *Asseo v. El Mundo Corp.,* 706 F.Supp. 116, 128 (D.P.R.1989).[20] We now examine whether these principles permit the application of such a remedy in the case before us.

The goal of a remedial order is "to create 'a restoration of the situation, as nearly as possible, to that which would have obtained' but for the unfair labor practices." *NLRB v. Keystone Steel & Wire,* 653 F.2d 304, 307 (7th Cir.1981) (quoting *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941)). Here, in the Board's view, the *status quo ante* remedy is justified by the nature and scope of the violation: from the start, U.S. Marine made clear that it had no intention of recognizing the Union. In furtherance of that goal, the company falsely manipulated manpower projections and unlawfully refused to hire thirty-four of its predecessor's employees in order to avoid triggering its duty to bargain as a successor employer. But for its unlawful conduct, U.S. Marine would have hired substantially all of Chrysler's employees and therefore would have been obligated to consult with the Union before setting the terms and conditions of employment. *See, e.g., Burns,* 406 U.S. at 294–95, 92 S.Ct. at 1585–86; *American Press,* 833 F.2d at 624–25; *Kallmann,* 640 F.2d at 1102. Thus, the Board maintains that U.S. Marine must reinstate the terms and conditions of employment in effect under Chrysler in order to restore the situation to what it would have been absent U.S. Marine's un-

---

**18.** The Board has construed the word "all" to mean "all or substantially all." *Kallmann v. NLRB,* 640 F.2d 1094, 1103 n. 18 (9th Cir.1981); *International Ass'n of Machinists & Aerospace Workers v. NLRB,* 595 F.2d 664, 671 n. 35 (D.C.Cir.1978), *cert. denied,* 439 U.S. 1070, 99 S.Ct. 839, 59 L.Ed.2d 36 (1979).

**19.** The Ninth Circuit in *Kallmann* concluded that a successor was obligated to consult with the union before setting the terms and conditions of employment and that failure to do so constituted a violation of the Act. 640 F.2d at 1102–03. Based on the facts of the case, however, the court declined to enforce a *status quo*

*ante* remedy, although that court previously had enforced such a remedy in *NLRB v. Potter's Drug Enterprises, Inc.,* 584 F.2d 980 (9th Cir. 1978), *enforcing without opinion* 233 N.L.R.B. 15 (1977).

**20.** *See also Elastic Stop Nut Div. of Harvard Indus.,* 294 N.L.R.B. No. 88, 131 L.R.R.M. (BNA) 1759, 1760 (1989), *enforced,* 921 F.2d 1275 (D.C.Cir.1990); *D & K Frozen Foods, Inc.,* 293 N.L.R.B. No. 104, 132 L.R.R.M. (BNA) 1053, 1053–54 (1989); *Fremont Ford Sales Inc.,* 289 N.L.R.B. No. 137, 131 L.R.R.M. (BNA) 1074, 1080–81 (1988); *State Distrib. Co.,* 282 N.L.R.B. 1048, 1048–50 (1987).

lawful conduct.[21] *See Keystone Steel & Wire*, 653 F.2d at 307.

In challenging the Board's imposition of the *status quo ante* remedy, U.S. Marine focuses on the Supreme Court's statement in *Burns* that such consultation is appropriate when "it is perfectly clear that the new employer plans to retain all of the employees in the unit." 406 U.S. at 294–95, 92 S.Ct. at 1585–86. The company submits that it was never "perfectly clear" that U.S. Marine intended to hire all of Chrysler's former employees. In our view, however, the Board was entitled to infer that, but for its unlawful purpose, U.S. Marine would have hired substantially all of the former Chrysler employees notwithstanding its announcement that it would set its own terms and conditions of employment. *See Kallmann*, 640 F.2d at 1102–03; *Shortway Suburban Lines*, 286 N.L.R.B. at 328; *State Distrib. Co.*, 282 N.L.R.B. 1048, 1048–49 (1987); *American Press*, 280 N.L.R.B. at 938; *Potter's Drug Enters.*, 233 N.L.R.B. at 20. U.S. Marine argues that, because the ALJ heard testimony from only twelve of the thirty-four former Chrysler employees involved in this case, it would be unfair to uphold the Board's determination that all of the former Chrysler employees would have been hired. However, U.S. Marine's unlawful conduct created any uncertainty concerning whether substantially all of the former Chrysler employees would have been hired. Because the company may not be permitted to benefit from its discriminatory activities, such uncertainty must be resolved against U.S. Marine. *Kallmann*, 640 F.2d at 1102–03; *Shortway Suburban Lines*, 286 N.L.R.B. at 328; *State Distrib.*, 282 N.L.R.B. at 1048–49; *American Press*,

280 N.L.R.B. at 938; *Potter's Drug Enters.*, 233 N.L.R.B. at 20.

Next, U.S. Marine relies on the Board's decision in *Spruce Up Corp.*, 209 N.L.R.B. 194 (1974), *enforced without opinion*, 529 F.2d 516 (4th Cir.1975). In *Spruce Up*, the Board held that

[w]hen an employer who has not yet commenced operations announces new terms prior to or simultaneously with his invitation to the previous work force to accept employment under those terms, we do not think it can fairly be said that the new employer "plans to retain all of the employees in the unit," as that phrase was intended by the Supreme Court.

*Id.* at 195. Consequently, concluded the Board, the successor's duty to consult the union before implementing changes in the terms of employment should apply only when the successor has failed to announce its intent to hire employees under new working conditions or has misled the predecessor's employees into believing that they would be retained under the same conditions. *Id.*

We believe that the company's reliance on *Spruce Up* and its progeny is misplaced. In *Spruce Up*, there was *a legitimate* ambiguity as to whether the new employer would in fact be able to hire the predecessor's employees because the new terms were substantially different from those of the predecessor. The employer did not refuse unlawfully to hire its predecessor's employees in order to avoid having to recognize and bargain with the union. By contrast, U.S. Marine, *by its illegal activity*, has created any ambiguity as to whether all or nearly all Chrysler employees would have accepted positions. That ambiguity must be resolved against it.[22]

**21.** This is not to say that U.S. Marine also must retain all unilateral changes that are beneficial to the employees. In its order, the Board required U.S. Marine to rescind all detrimental unilateral changes and reinstitute the terms and conditions of employment that were in effect when Chrysler closed its doors. The Board noted that nothing in its order was "to be construed as requiring rescission of any wage increase or other benefits that previously have been granted the unit employees." D & O at 9 n. 6. Thus, the Board did not require U.S. Marine both to re-

store the *status quo ante* and leave in place all beneficial changes, such as the wage increase implemented on January 21, 1985, but left that decision up to the company.

**22.** The Board's *Spruce–Up* doctrine has been endorsed and somewhat reformulated by the Second Circuit. *See Saks & Co. v. NLRB*, 634 F.2d 681 (2d Cir.1980); *Nazareth Regional High School v. NLRB*, 549 F.2d 873 (2d Cir.1977); *Brotherhood of Railway etc. v. REA Express, Inc.*, 523 F.2d 164 (2d Cir.), *cert. denied*, 423 U.S.

 U.S. Marine correctly argues that the Board may not impose punitive remedies. *See NLRB v. Strong,* 393 U.S. 357, 359, 89 S.Ct. 541, 543, 21 L.Ed.2d 546 (1969); *NLRB v. Emsing's Supermarket, Inc.,* 872 F.2d 1279, 1291 (7th Cir.1989). Although the Board's "choice of remedy must ... be given special respect by the reviewing courts," *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969), "the remedy chosen must 'achieve the remedial objectives which the Act sets forth,'" *Yorke v. NLRB,* 709 F.2d 1138, 1144–45 (7th Cir.1983) (quoting *Republic Steel Corp. v. NLRB,* 311 U.S. 7, 12, 61 S.Ct. 77, 79, 85 L.Ed. 6 (1940)), *cert. denied,* 465 U.S. 1023, 104 S.Ct. 1276, 79 L.Ed.2d 680 (1984); *Emsing's Supermarket,* 872 F.2d at 1291 (quoting *Yorke*). Because the Board's order remedies a violation of the Act, we cannot accept the company's claim that the Board's order is punitive. In this case, the Board specifically concluded that its order to restore Chrysler's terms of employment was "strictly a remedial matter," designed simply to "restor[e] as nearly as possible the situation

that would have prevailed but for [U.S. Marine's] unfair labor practices." D & O at 10. U.S. Marine's unfair labor practice—discriminating against former employees because of their union membership—created ambiguity as to whether substantially all of the predecessor's employees would have been retained, a crucial precondition for bargaining with the union over initial terms of employment. The Board's order is designed to prevent U.S. Marine from taking advantage of its wrongdoing to the detriment of the employees. The Board presumes that, but for the unlawful practice, substantially all of the employees would have been retained and the employer would be obliged to consult with the union before setting new terms. Because of this obligation to bargain with the Union, restoration of the previously existing employment terms, the *status quo ante,* is an appropriate remedy. It is an imprecise remedy because it must estimate to some degree the situation that would have occurred if there had been no discrimination and the old work force, through its union, had commenced negotiations with the employer. Some terms offered by the

1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975). This process began in *REA Express,* where the court indicated its understanding of the *Burns* exception as "being limited to those situations where employees are led at the outset by the successor-employer to believe that they will have continuity of employment on pre-existing terms and as not applying where the new employer dispels any such impression prior to or simultaneously with its offer to employ the predecessor's work force." *Id.* at 171 (citations omitted). Again, in *Nazareth Regional High School,* the Second Circuit refused to find a perfectly clear exception where the successor employer never indicated to the employees that they would be hired on identical terms. As the court stated, "[t]he important consideration in determining whether it is perfectly clear that a successor intends to retain all of the employees is whether they have all been promised re-employment on the existing terms." 549 F.2d at 881. Finally, in *Saks & Co.,* the Second Circuit articulated its understanding of the perfectly clear exception:

> [A] successor employer is required to bargain with respect to initial terms only if it is perfectly clear that it plan [sic] to retain all the employees in the predecessor unit and hires those employees in a manner which leads them to believe that they will be hired on the terms and conditions that existed under the predecessor employer.

634 F.2d at 687.

Under the Second Circuit's formulation of the *Burns* exception, a union must show: (1) that it was perfectly clear that the employer intended to rehire substantially all of the predecessor's employees; *and* (2) that it intended to do so on identical terms. Applied literally, this reformulation of the *Burns* exception would appear to limit the *Burns* exception to situations where the employer announces that it intends to offer exactly the same terms; there would only be a duty to bargain with the union when nothing will be changed. However, this is an issue that we need not confront definitively in this case. In *none of these cases did the Board find that* the employer had discriminated against former employees because of their union membership. Here, by contrast, the Board found that substantially all the predecessor's employees would have been retained but for the successor's unlawful discrimination. Under these circumstances, an employer whose unfair labor practices have created ambiguity as to whether substantially all of the predecessor's employees would have been retained will not be permitted to profit from the situation. Instead, the Board will presume that, but for the discriminatory practices, substantially all of the employees would have been retained and the employer would be obliged to consult with the union before setting new terms.

new employer may be considered favorable by the employees; some may be considered unfavorable. An employment package has many components. A return to the *status quo ante* at least allows the bargaining process to get under way. As the Board correctly noted,

> "[a] remedy that allowed to stand the reduced terms and conditions of employment that the Respondent imposed unilaterally ... would quite possibly leave victims uncompensated and it would confer *Burns* rights on an employer that has not conducted itself like a lawful *Burns* successor because it has unlawfully blocked the process by which the obligations and rights of such a successor are incurred."

D & O at 11 (quoting *State Distrib. Co.*, 282 N.L.R.B. 1048, 1049 (1987)). The Board's order was an appropriate attempt to give meaning to the "perfectly clear" exception of *Burns* when the employer's conduct has confused the situation.

"Restoration of the *status quo ante* following an unfair labor practice is *prima facie* appropriate; it is for the [employer] to demonstrate that it is not appropriate." *North Carolina Coastal Motor Lines, Inc.*, 219 N.L.R.B. 1009, 1010 (1975), *enforced*, 542 F.2d 637 (4th Cir.1976).[23] U.S. Marine has failed to do so.

■ Finally, U.S. Marine claims that imposition of the *status quo ante* remedy offends due process because the unfair labor practice charge did not allege that the company had violated the Act by setting the initial terms of employment in January 1984 without first consulting with the Union. First, the charge specifically alleged that the company had violated section 8(a)(3) and (5) of the Act by refusing to hire thirty-four former Chrysler employees in order to avoid a bargaining obligation and by refusing to bargain with the Union. The remedy ordered in this case is based on the established principles applicable to successors who discriminate in order to avoid a bargaining obligation; such employers lose the right to set initial terms and conditions of employment and may be ordered to rescind any changes in those terms and compensate employees for losses in order to put them in the position they would have been but for the employer's unlawful conduct. *E.g.*, *Shortway Suburban Lines*, 286 N.L.R.B. at 329–30; *State Distrib.*, 282 N.L.R.B. at 1048–50; *American Press*, 280 N.L.R.B. at 943–44. Thus, as the Board concluded, the illegal nature of the unilateral changes was subsumed in the broader section 8(a)(3) and (5) allegations and violations involved in the case. Consequently, U.S. Marine was "on notice that the Board might apply an appropriate remedy in its power should the Board find the violations alleged." D & O at 11.

Moreover, strictly remedial matters need not be specifically alleged in the unfair labor practice complaint. *North Carolina Coastal Motor Lines*, 219 N.L.R.B. at 1009.[24] As this court recently noted in

---

23. *See also NLRB v. Strong*, 393 U.S. 357, 359, 89 S.Ct. 541, 543, 21 L.Ed.2d 546 (1969) (Act does not authorize punitive measures, but makewhole remedy that compensates employees "'for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces'") (quoting *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197, 61 S.Ct. 845, 854, 85 L.Ed. 1271 (1941)); *NLRB v. Keystone Steel & Wire*, 653 F.2d 304, 306–08 (7th Cir.1981) (*status quo ante* remedy imposed after employer unilaterally altered term of employment was not punitive; fact that "some employees ultimately may receive greater benefits than they would have received if the Company had not acted illegally" is not due to defect in Board's order, but to employer's unlawful conduct, *id.* at 308).

24. *See also Sinclair Glass Co.*, 188 N.L.R.B. No. 33, 76 L.R.R.M. (BNA) 1289 (1971), *enforced*,

465 F.2d 209 (7th Cir.1972), where the Board imposed a *status quo ante* remedy and stated that it did

> not believe that our make-whole remedy should be withheld on the ground that the Charging Party and the General Counsel have not requested such a remedy or the circumstance that the Respondent has not violated Section 8(a)(5) as well as Section 8(a)(3) in this instance. It is a principle too well established in Board law to require citation of authority that a question of remedy is within the discretion of the Board. Section 10(c) [29 U.S.C. § 160(c)] *directs* the Board ... "to take such affirmative action ... as will effectuate the policies of this Act."

*Id.* at 1291 (emphasis in original). Similarly, we do not believe that the *status quo ante* remedy, which was imposed to make whole U.S.

*NLRB v. Schwab Foods, Inc.,* "[i]t is well-settled that, while General Counsel's complaint must give a respondent fair notice of the violations charged, '[i]t is unnecessary for the complaint to spell out the details of the relief to be requested if it is found that the Act has been violated.'" 858 F.2d 1285, 1294 (7th Cir.1988) (quoting *NLRB v. Winchester Elecs., Inc.,* 295 F.2d 288, 292 (2d Cir.1961)).[25] Moreover, U.S. Marine has failed to show that it was prejudiced in any way by the General Counsel's failure to allege specifically that the company was not entitled to set the initial terms and conditions of employment. Had the company formally and specifically been informed of the possibility of the imposition of this remedy, its rejoinder would have been duplicative or cumulative of its other submissions. The company would have argued that it was not under a duty to consult with the Union before setting the terms and conditions of employment because former Chrysler workers would not constitute a majority of the company's full work force.[26]

In sum, we conclude that, had U.S. Marine not engaged in unlawful conduct, it would have been obligated to consult with the Union before setting the initial terms and conditions of employment and would have been under a duty to recognize and bargain with the Union in good faith. Instead, the company imposed its own terms and bargained in bad faith. Ordering U.S. Marine to reinstitute the terms of employment in effect under Chrysler restores, "'as nearly as possible,'" the environment in which U.S. Marine should have bargained. *Keystone Steel & Wire,* 653 F.2d at 307 (quoting *Phelps,* 313 U.S. at 194, 61 S.Ct. at 852). The Board's order remedies the company's unlawful refusal to bargain

as a successor and unlawful refusal to hire thirty-four former Chrysler employees and therefore effectuates the policies of the Act. The order is not punitive and does not violate U.S. Marine's due process rights. As such, it is entitled to enforcement.[27]

### E. *The Union's Appeal*

The Union challenges the Board's remedial order in three respects. First, the Union contends that the Board's refusal to include a visitorial clause constitutes an abuse of the Board's discretion. Second, the Union claims that the Board exceeded the bounds of its discretion in failing to direct U.S. Marine to reimburse the Union for its litigation expenses. Finally, the Union asserts that the Board's failure to refer this case to the Justice Department constitutes legal error.

#### 1. Visitorial clause

■ The Union claims that the Board abused its discretion by failing to include the visitorial clause recommended by the ALJ. More specifically, the Union challenges the Board's mere citation to *Cherokee Marine Terminal,* 287 N.L.R.B. No. 53, 128 L.R.R.M. (BNA) 1051 (1988), and summary rejection of the ALJ's recommendation. In *Cherokee Marine,* the Board declined the General Counsel's invitation to include regularly a "model" visitorial clause in its remedial orders. *Id.* at 1052. The Board found that inclusion of the clause "would not further the Board's remedial goals more effectively than enforcement mechanisms already available." *Id.* Moreover, the Board was "especially troubled by practical concerns ... and by the potential for abuse inherent in [the visitorial clause's] lack of limits, specificity, and

---

Marine's employees, should be deleted from the Board's order.

**25.** In *Winchester Electronics,* 295 F.2d at 292, the Second Circuit noted that "if the complaint alleges unfair labor practices that could result in the Board's use of such a remedy, the respondents have been sufficiently informed."

**26.** The company asserts that it would have offered additional evidence that applicants were informed in advance that they would be work-

ing under different terms. However, U.S. Marine established that point, and further evidence would have been merely cumulative.

**27.** *See Keystone Steel & Wire,* 653 F.2d at 307 (order including *status quo ante* remedy was enforced where employer unilaterally altered health benefits without consulting union; remedy of "correcting a unilateral change in a term or condition of employment" was "consistent with an important policy behind the Act").

procedural safeguards." *Id.* at 1053. Of particular concern was the fact that, as in this case, the recommended clause set no time limits on the Board's access to the company's records and statements. *Id.; see supra* note 7. Based on these and other concerns, the Board concluded that

> broad visitatorial rights ... will remain an extraordinary remedy to be used only when warranted by the facts of a particular case.
>
> ....
>
> ... Therefore, we will continue to grant visitatorial rights, on a case-by-case basis, when the equities demonstrate a likelihood that a respondent will fail to cooperate or otherwise attempt to evade compliance.

128 L.R.R.M. at 1052, 1054.[28]

In this case, the Board adopted the ALJ's factual conclusions regarding the employer's conduct, but specifically found, in light of *Cherokee Marine*, that a visitatorial clause was not warranted. The court in *Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946 (D.C.Cir.1988), *cert. denied*, 490 U.S. 1065, 109 S.Ct. 2063, 104 L.Ed.2d 628 (1989), upon which the Union relies, expressly declined to comment on the necessity of a visitorial clause, noting that the matter was for the Board to assess in the first instance. *Id.* at 958. The Board has made such an assessment here. Given our standard of reviewing the Board's remedial determinations, *see supra* pp. 1313–14, we decline to disturb the Board's conclusion that a visitorial clause was unnecessary to remedy U.S. Marine's violations of the Act.[29]

### 2. Litigation expenses

Before the Board, the Union took exception to the ALJ's failure to award legal costs, attorney fees, and the costs incurred by the Union in attending bargaining sessions. The Board subsequently ordered U.S. Marine to reimburse employee members of the Union's negotiating committee for wages lost while attending negotiating sessions, but did not address the Union's request for litigation costs. The Union argues that the Board's failure to address this issue and to order U.S. Marine to reimburse the Union for such costs constitutes an abuse of the Board's discretion.

**28.** The Union relies upon *Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946 (D.C.Cir.1988), *cert. denied*, 490 U.S. 1065, 109 S.Ct. 2063, 104 L.Ed.2d 628 (1989), for the proposition that "the Board's cursory reference to its *Cherokee Marine Terminal* decision [was rejected] as being an adequate justification to deny a visitorial clause." Union's Br. at 14. The Union's reliance on this case is misplaced. In *Teamsters Local 171*, the Board adopted the ALJ's conclusion that the employer's violation of the Act evidenced a complete disregard for the rights of its employees, but rejected the ALJ's recommended inclusion of a visitorial clause. 863 F.2d at 958. Significantly, the Board's order *predated* the *Cherokee Marine* decision. See *id.* at 947. The District of Columbia Circuit did not hold, as the Union argues, that the Board may not support its conclusions by mere citation to an earlier case. Indeed, such a position would have been in error. As the Supreme Court has acknowledged, "the Board may articulate the basis of its order by reference to other decisions ... so long as the basis of the Board's action ... meets the criteria for judicial review." *NLRB v. Metropolitan Life Ins. Co.*, 380 U.S. 438, 443 n. 6, 85 S.Ct. 1061, 1064 n. 6, 13 L.Ed.2d 951 (1965) (case remanded where Board's action could not properly be reviewed because Board failed to articulate reasons for its decision). We do not find a similar problem here. The Board's reliance on *Cherokee Marine*, where the Board reviewed the problems associated with visitorial clauses and determined that they are to be included in remedial orders only when warranted by the facts of a given case, makes it sufficiently clear that, for purposes of judicial review, the Board disclosed the basis of its order and indicated that it had exercised its discretion. *See Metropolitan Life*, 380 U.S. at 443, 85 S.Ct. at 1064. Rather, the court in *Teamsters Local 171* determined that a remand was necessary to allow the Board to reconsider its rejection of the recommended visitorial clause in light of the intervening *Cherokee Marine* decision. 863 F.2d at 958.

**29.** Moreover, the order we enforce today allows the Board access to U.S. Marine's records relevant to compliance with the back pay and reinstatement provisions. Although the evidence certainly supports the Board's determination that U.S. Marine engaged in multiple unfair labor practices, there is not such overwhelming evidence of a likelihood that the company will "fail to cooperate or otherwise attempt to evade compliance," *Cherokee Marine Terminal*, 287 N.L.R.B. No. 53, 128 L.R.R.M. (BNA) 1051, 1054 (1988), that we can say it was an abuse of the Board's discretion not to include a visitorial clause.

Accordingly, the Union requests that the case be remanded to the Board.[30]

The Board first ordered an employer to reimburse litigation costs and expenses in *Tiidee Products, Inc.*, because the employer had engaged in "patently frivolous" litigation. 194 N.L.R.B. 1234, 1235 n. 10, 1236–37 (1972), *enforced in relevant part sub nom. International Union of Elec. Workers v. NLRB*, 502 F.2d 349 (D.C.Cir. 1974), *cert. denied*, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975). "Under *Tiidee Products*, the Board may order certain extraordinary remedies, such as the payment of attorney's fees, if it determines that a party has engaged in frivolous litigation." *Farrens Tree Surgeons, Inc.*, 264 N.L.R.B. No. 90, 111 L.R.R.B. (BNA) 1305, 1305 (1982); *see also Autoprod, Inc.*, 265 N.L.R.B. No. 42, 111 L.R.R.M. (BNA) 1521, 1522 (1982) (reimbursement of expenses ordered where employer's arguments were "patently frivolous" and employer had long history of intransigence).[31]

The Board refrains from assessing litigation costs " 'where the defenses raised by [the employer] are "debatable" rather than "frivolous." ' " *Workroom for Designers, Inc.*, 274 N.L.R.B. No. 115, 119 L.R.R.M. (BNA) 1067, 1071 (1985) (quoting *Heck's, Inc.*, 215 N.L.R.B. 765, 767 (1974)).[32] Of particular importance in determining whether a defense is "debatable" or "frivolous" is the degree to which the outcome of the case depends upon credibility determinations. For example, in *Farrens Tree Surgeons*, an employer sought litigation costs after the unfair labor practice complaint against it was dismissed. 111 L.R.R.M. at 1305. The Board could not conclude that the litigation was frivolous and therefore refused to award such costs. Of significance was the fact that the dismissal "was based, *in part*, on [the ALJ's] credibility resolution" of a witness' testimony. *Id.* (emphasis supplied). Similarly, in *Workroom for Designers*, where an award

**30.** As a threshold matter, we reject the Union's contention that, because the Board did not articulate its reasons for denying the Union's requested relief, this case *must* be remanded. The Union relies on *K & I Transfer & Storage, Inc. v. NLRB*, 805 F.2d 749 (7th Cir.1986), in urging that a remand is required. However, this case is factually distinguishable from *K & I Transfer*, where the prevailing party filed an application for attorney fees pursuant to the Equal Access to Justice Act. Here, the Union provided the ALJ with a recommended order and excepted to the ALJ's refusal to grant all of the relief requested. In *K & I Transfer*, the Board had failed in its order to make any reference to the company's request for costs, and the court was unable to find that the order had "implicitly rejected" that request. *Id.* at 753. By contrast, in this case, we conclude that the Board implicitly rejected the Union's exception with regard to litigation costs. In its exceptions, the Union challenged "[t]he ALJ's remedy and order insofar as they fail ... to require [U.S. Marine] to pay to the Union those costs and expenses the Union incurred in attending fruitless bargaining meetings with [U.S. Marine's] representatives and its legal costs and reasonable attorney fees." Union's Exceptions to the ALJD (Sept. 25, 1986) at 3. The Board specifically addressed the first portion of this exception and ordered U.S. Marine to reimburse employee members of the Union's negotiating committee for the time spent in bargaining sessions. While we disapprove of the Board's failure to put its denial in writing, we are able to conclude that, based on this tacit rejection of the Union's request, the

record before us, and the applicable law, denying the requested relief was well within the Board's discretion.

**31.** *But see NLRB v. Food Store Employees Union*, 417 U.S. 1, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974), where the union sought reimbursement of litigation expenses and excess organizational costs incurred as a result of the employer's unlawful conduct. The Board had refused to award such expenses, but the court of appeals enlarged the Board's order and awarded the costs, relying on the Board's intervening decision in *Tiidee Products*. The Supreme Court determined that the court of appeals did not have the statutory authority to so enlarge the Board's order and therefore remanded the case to allow the Board to consider whether *Tiidee Products* would be applied retroactively. *Id.* at 8–10, 94 S.Ct. at 2079–80. However, the Court expressly reserved the question of whether the Board's authority to fashion remedies includes the power to award litigation expenses. *Id.* at 8 n. 9, 94 S.Ct. at 2079 n. 9.

**32.** This is true even when the employer has committed "flagrant" unfair labor practices and engaged in " 'clearly aggravated and pervasive misconduct.' " *Workroom for Designers*, 119 L.R.R.M. at 1071 (quoting *Heck's*, 215 N.L.R.B. at 767). Thus, the Board refused to award litigation costs in *Workroom for Designers*, although the employers committed "numerous and egregious" unfair labor practices, discriminated against most of their employees, and even stipulated to their antiunion animus. *Id.* at 1070.

of legal fees and expenses was found inappropriate due to the employer's debatable defenses, the Board emphasized the fact that "[t]he merits of several of the complaint's allegations turned on credibility resolutions." 119 L.R.R.M. at 1071.

The Supreme Court has stated that an appellate court may not enlarge the Board's order, but must remand the case when the court "concludes that an agency invested with broad discretion to fashion remedies has apparently abused that discretion by omitting a remedy justified in the court's view by the factual circumstances." *NLRB v. Food Store Employees Union,* 417 U.S. 1, 10, 94 S.Ct. 2074, 2080, 40 L.Ed.2d 612 (1974). In this case, we conclude that the factual circumstances do not justify a remand. Neither the ALJ nor the Board found this litigation frivolous. Moreover, the outcome of the unfair labor practice charges against U.S. Marine turns almost solely on the ALJ's credibility determination, which the Board adopted, of Mr. Hoag's testimony. As the Union itself notes, most of U.S. Marine's unlawful conduct stems from its reliance on the falsely inflated work force estimates. *See* Union's Br. at 17. Because, unlike the situation in *K & I Transfer & Storage, Inc. v. NLRB,* 805 F.2d 749, 753 (7th Cir.1986), we can conclude that the Board implicitly—and justifiably—rejected the request for litigation costs, a remand on this issue is not appropriate.

### 3. Referral to the Justice Department

■ The Union's final claim is without merit. The Union asserts that the Board erred in not referring this case to the Justice Department pursuant to 18 U.S.C. § 1001, which prohibits the giving of knowingly false or fraudulent statements in a matter within the jurisdiction of a governmental agency.[33] The basis of the Union's claim is the Board's conclusion that James Hoag falsely inflated the anticipated employment figures to deceive the Board and the courts. The ALJ considered the Union's request, but determined that the interests of justice would not be served by drawing Mr. Hoag's conduct to the attention of the Justice Department. The Board did not specifically address this issue in its Decision and Order.

We have found no case *requiring* the Board to refer cases to the Justice Department. Certainly, the Board need not include such a referral in its order disposing of an unfair labor practice.

### Conclusion

For the foregoing reasons, we deny U.S. Marine's and the Union's petitions for review and grant enforcement of the Board's order.

PETITIONS FOR REVIEW DENIED; CROSS-PETITION FOR ENFORCEMENT GRANTED.

EASTERBROOK, Circuit Judge, with whom POSNER, COFFEY, MANION and KANNE, Circuit Judges, join, concurring in part and dissenting in part.

Substantial evidence supports the Board's conclusion that U.S. Marine did what it thought expedient to evade its obligation to bargain collectively with its workers. A remedy is in order.

Again, with emphasis: a *remedy* is in order. Unlike other agencies that may impose fines and penalties to deter misconduct, the Labor Board is confined to make-whole relief. It may put the workers in the position they would have occupied had there been no violation, and it may restrain future violations. *Sure-Tan, Inc. v. NLRB,* 467 U.S. 883, 900–01, 104 S.Ct. 2803, 2813–14, 81 L.Ed.2d 732 (1984); *NLRB v. Strong,* 393 U.S. 357, 359, 89 S.Ct. 541, 543, 21 L.Ed.2d 546 (1969); *Phelps Dodge Corp. v. NLRB,* 313 U.S.

---

**33.** Section 1001 provides as follows:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.
18 U.S.C. § 1001.

177, 194–98, 61 S.Ct. 845, 852–54, 85 L.Ed. 1271 (1941); *Republic Steel Corp. v. NLRB,* 311 U.S. 7, 10–12, 61 S.Ct. 77, 78–79, 85 L.Ed. 6 (1940); *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 235–36, 59 S.Ct. 206, 219–20, 83 L.Ed. 126 (1938). See also § 10(c) of the National Labor Relations Act, 29 U.S.C. § 160(c). Any excess is a penalty.

Perhaps the agency should have the power to penalize, but it does not. What the Board characterizes as a "forfeiture" of the successor employer's privilege to set its own terms and conditions of employment is a penalty by another name—and not a much different name at that. I therefore disagree with Part II.D of the court's opinion, which requires U.S. Marine to apply to its entire workforce in 1991 the terms and conditions that Chrysler was using when it closed in 1983, and to provide back pay based on these 1983 terms. I join the remainder of the opinion.

Step one in resolving the question whether the Board's order is a remedy is determining what would have happened if U.S. Marine had respected its obligations under the law. Perhaps U.S. Marine was obliged to afford its workers the benefit of the Chrysler contract, on the theory that when a successor is likely to hire most of the predecessor's workers, it must use the predecessor's terms until the union consents to the change or the parties reach impasse after lengthy good-faith bargaining. Cf. *Litton Financial Printing v. NLRB,* —— U.S. ——, 111 S.Ct. 2215, 2221–23, 115 L.Ed.2d 177 (1991). Although our panel so held, today no member of this court endorses that belief. The language and rationale of *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), like the Court's other successorship cases, create only a bargaining obligation even if the successor plans to (and does) hire all of its predecessor's employees.

A bona fide sale of the business enables the successor to start with its own terms. *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 40, 107 S.Ct. 2225, 2234, 96 L.Ed.2d 22 (1987); *Burns,* 406 U.S. at 284–91, 92 S.Ct. at 1580–84. Change may be the only alternative to consigning the plant to the scrap heap. *Burns,* 406 U.S. at 287–88, 92 S.Ct. at 1582–83. Denying the successor the right to establish its own wages and other terms whenever it is likely to hire substantially all of the predecessor's workers could prevent this process from occurring and lead to liquidation rather than revivification. Paradoxically it also would discourage successors from making generous offers to labor. If the buyer offers an attractive package of wages and other terms and conditions of employment, many of the old employees will want to cross over; the NLRA forbids discrimination against them; once they cross over the employer would be forced to restore the old package in toto—even if it makes the transaction uneconomic. If the buyer offers a package that is unattractive to the old work force, it avoids any risk of being forced to up the ante, but it also may have trouble hiring workers with the skills needed to run the business.

The Board implies that when the new employer wants to change the work rules but is willing to offer high wages, it can't do so (because too many of the old employees will apply), while if the work rules are OK and the new employer wants to drop the wages, it may do this because it will believe that it has made the job unattractive to the old workers. Neither labor law nor the economics of restoring failing businesses to health supports or allows such a distinction—especially not when the only way to know whether the predecessor's workers are likely to transfer their loyalties is to see whether they do.

The Second, Fourth, Ninth, and District of Columbia Circuits have held that successors may set their own terms and conditions whether or not the firm expects its predecessor's employees to cross over *en masse. Saks & Co. v. NLRB,* 634 F.2d 681, 687–88 (2d Cir.1980); *Nazareth Regional High School v. NLRB,* 549 F.2d 873, 881–82 (2d Cir.1977); *NLRB v. Spruce Up Corp.,* 529 F.2d 516 (4th Cir.1975), enforcing 209 N.L.R.B. 194 (1974); *Kallmann v. NLRB,* 640 F.2d 1094, 1102–03 (9th Cir. 1981); *NLRB v. Dent,* 534 F.2d 844, 847

(9th Cir.1976); *International Association of Machinists v. NLRB*, 595 F.2d 664, 672–76 (D.C.Cir.1978). These courts conclude that the remark in *Burns*, 406 U.S. at 294–95, 92 S.Ct. at 1585–86, that "there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms" does not prevent the successor from setting initial terms. The Court said that a successor may be required to consult with the union; an obligation to "consult" does not imply an obligation to use the old terms unless the union agrees to different ones. The workers have a self-help response if the successor's package is unacceptable: they may decide, individually or collectively (recall that they are already organized), not to work unless the successor sweetens the pot.

Elsewhere in *Burns* the Court wrote: "It does not follow ... from [the successor's] duty to bargain that it was bound to observe the substantive terms of the collective-bargaining agreement the union had negotiated with [the predecessor] and to which [the successor] in no way agreed." 406 U.S. at 281–82, 92 S.Ct. at 1579. Part III of *Burns*, *id.* at 281–91, 92 S.Ct. at 1579–84, rejects the Board's position that the successor is substantively bound—a position that the Board wants to revive under the guise of "remedy". Part IV of the opinion, *id.* at 292–96, 92 S.Ct. at 1584–86, in which the "perfectly clear" sentence appears, is about bargaining rather than substance. To emphasize this, the Court noted: "It is difficult to understand how [the successor] could be said to have *changed* unilaterally any pre-existing term or condition of employment without bargaining when it had no previous relationship whatsoever to the bargaining unit and, prior to [taking over], no outstanding terms and conditions of employment from which a change could be inferred." *Id.* at 294, 92 S.Ct. at 1585 (emphasis in original). The Board ignores that observation—plus Part III of *Burns*, and all of *Fall River*—in

favor of a tunnel-vision reading of the "perfectly clear" sentence.

A conclusion that the pertinent obligation is to consult with the union sets up the critical question: how can it be remedial to require the successor to use the old terms? My colleagues observe that U.S. Marine's "unlawful conduct created ... uncertainty concerning whether substantially all of the former Chrysler employees would have been hired." 944 F.2d at 1321. I agree with the court that the Board could resolve against U.S. Marine all factual ambiguities created by its illegal conduct. Let us take it as established that, but for its unfair labor practices, U.S. Marine would have hired substantially all of Chrysler's workers. How does this support the Board's order? U.S. Marine would have been free to use its own terms even if it had shouted from the rooftops that it planned to hire every Chrysler employee who applied. Uncertainty about the number of workers to be hired cannot matter when even perfect knowledge would not support the Board's directive.

If, as four other courts of appeals hold, U.S. Marine was entitled to implement new terms when it took over, no matter how many of Chrysler's workers it expected to hire, then these terms establish the benchmark that the Board is entitled to restore. Had U.S. Marine followed the NLRA to a T, all would have labored on U.S. Marine's terms, not Chrysler's. Subsequent unfair labor practices were designed only to avert the need to bargain with the union. How could it be said that unfair labor practices designed to stymie bargaining require the successor to use particular terms? The Board's rationale is:

> The *Love's Barbeque* remedy that we order here does not require a specific complaint allegation that the Respondents made unlawful unilateral changes when they began their operations. Nor must this remedy rest on a separate finding that the Respondents committed a separate unfair labor practice by unilaterally changing employment terms. The illegality of such changes is subsumed in the broader 8(a)(5) and (3) allegations and violations involved in this case. As noted

above, an employer—like the Respondents—that unlawfully discriminates in its hiring in order to evade its obligations as a successor does not have the *Burns* right to set initial terms of employment without first consulting the Union. The Respondents forfeited any right they may have had as a successor to impose initial terms when they embarked on their deliberate scheme to avoid bargaining with the Union by their discriminatory hiring practices.

293 N.L.R.B. No. 81 at 10. Whatever else one might say about this passage, it fails to explain—fails to *attempt* to explain—why the *"Love's Barbeque* remedy" is a remedy rather than a penalty. The telling term "forfeited" gives away the game. (A *"Love's Barbeque* remedy", after *Love's Barbeque Restaurant,* 245 N.L.R.B. 78 (1979), enforcement denied in relevant part under the name *Kallmann v. NLRB,* 640 F.2d 1094, 1102–03 (9th Cir.1981), is the Board's argot for an order to use a predecessor's wages, terms, and conditions of employment and extend back pay accordingly.)

What are the "obligations as a successor" that U.S. Marine "evade[d]"? Much of the Board's discussion preceding the passage I have quoted assumes that U.S. Marine had to start off with Chrysler's terms if it expected most of Chrysler's employees to want to work for it, using these terms until the union agreed to others or good faith bargaining ended in impasse. Such an obligation would make the Board's order a remedy (for the union has never agreed to changes), but there is no such obligation.

One genuine obligation is to act without discrimination in evaluating those of the predecessor's employees who offer to work. The Board found that U.S. Marine discriminated against 34 of the 257 applicants. The remedy for this sin is to hire the 34; it is not remedial to augment the offer to the other workers or to give these 34 terms better than they would have had if U.S. Marine had hired them in 1984. Had U.S. Marine hired these 34 (rather, had it evaluated their applications without

discrimination), the terms afforded all workers still would have been those U.S. Marine set, not those Chrysler set.

The second "obligation[ ] as a successor" that U.S. Marine evaded is to bargain once it expects a majority of its workers to come from Chrysler's employees. See *Fall River,* 482 U.S. at 46–52, 107 S.Ct. at 2237–41. The remedy for this evasion is a bargaining order. If the Board were to find that, had U.S. Marine bargained in good faith as the Act requires, it would have agreed to the terms of the Chrysler contract, then it might be possible to say that the Board's order imposing those terms on U.S. Marine is a remedy. The Board made no such finding—understandably. The opportunity to change the antiquated work rules at this outboard motor plant was one of the things creating a prospect for turning this losing venture around. In May 1984, less than five months after U.S. Marine took over, the district court issued a § 10(j) injunction requiring U.S. Marine to bargain with the union. *Squillacote v. U.S. Marine Corp.,* 116 L.R.R.M. 2663 (E.D.Wis.1984); see also *Szabo v. U.S. Marine Corp.,* 819 F.2d 714, 718–21 (7th Cir.1987). Seven years of bargaining have not led to restoration of Chrysler's terms. It is unimaginable that U.S. Marine would have agreed to use those terms had the bargaining begun in January 1984 (when it should have) rather than May 1984 (when it did). The Board's rationale is unrelated to the anticipated (or actual) outcome of bargaining; instead the Board found that by deeds after reopening the plant U.S. Marine retroactively "forfeited" the entitlement to set its own terms. That is the language of penalty; its order is the fact of penalty.

Counsel for the Board offered another rationale: if U.S. Marine had known all along that it would be required to bargain with the union, it might not have taken over the plant. Had U.S. Marine kept out of the picture, the workers would have retained the benefits of their collective bargaining agreement with Chrysler. Counsel suggested alternatively that U.S. Marine might have adopted Chrysler's terms to hold down friction with the union. Now the Board said no such things, so counsel's

rationalization presents a *Chenery* problem. Let that pass. No such findings could be sustained. If U.S. Marine (or some equivalent buyer) had not appeared, Chrysler would have closed the plant; the workers would have received unemployment compensation, not the wages and terms of the Chrysler contract. U.S. Marine was willing to come in only if it could make the changes it believed were essential to turn this plant around.

Our court endorses none of the Board's approaches (which makes my colleagues' refrain about deference to the Board puzzling, see *Sure–Tan*, 467 U.S. at 899–900 & n. 9, 104 S.Ct. at 2812–13 & n. 9). Instead the majority rings changes on the theme that it is hard to know how many of Chrysler's workers would have been hired had U.S. Marine behaved itself. This approach is our court's invention. As the successor need not use the predecessor's terms just because it expects to hire substantially all of the predecessor's workers, the uncertainty has no legal significance. Yet the majority is unwilling to hold that labor law creates such a substantive obligation. The Board's rationales are defective; the majority's substitute is mysterious.

Labor law commands us to patrol the border between remedy and penalty. Perhaps that indistinct line is not worth drawing. Lack of authority to penalize, and thus to deter, means that there will be too many violations. Agencies, sensing the need to pack a wallop, strain against the limits of their powers and create *de facto* penalties. Needing to make a penalty look like a remedy, the Board prescribes back pay and restoration of terms—in other circumstances remedial, but here exceeding the sanction that would be appropriate if the Board had the power to impose explicit fines. Chrysler's workers received generous severance packages on the premise that U.S. Marine was not a mere continuation of the old business. *Allied Industrial Workers Local 879 v. Chrysler Marine Corp.*, 819 F.2d 786 (7th Cir.1987). They have received wages from U.S. Marine to compensate them for the elimination of the antique manning tables and work rules. Now they receive a third salve, in back pay,

for the loss of the work rules they enjoyed when Chrysler ran the plant, and U.S. Marine must use those rules from now on. None of this is remedial, and as a penalty it is not only too high but also interferes with the future operation of the plant. How much cleaner if the Board could levy a hefty fine, distribute the money to the workers, and be done. Instead the Board's pretense of "remedy" has produced an order that may make profitable production impossible. By approving this masquerade we preserve featherbedding, increase the risks of taking over foundering firms, and frustrate the revival of aging plants. Neither American workers nor American consumers will welcome this consequence.